**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 12-1334**
_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

AGAPE CHURCH, INC., *et al.*,

Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

Respondents.
_____

**ON PETITION FOR REVIEW OF AN ORDER OF THE**
**FEDERAL COMMUNICATIONS COMMISSION**
_____

**JOINT BRIEF FOR PETITIONERS AGAPE CHURCH, INC.,**
**LONDON BROADCASTING COMPANY, INC., NATIONAL**
**ASSOCIATION OF BROADCASTERS, AND UNA VEZ MAS, LP**
_____

Helgi C. Walker*
Kathleen A. Kirby
Eve Klindera Reed
Christiane M. McKnight
Wiley Rein LLP
1776 K Street NW
Washington DC 20006
Tel:  202.719.7000

*Attorneys for Joint Petitioners*

Dated:  November 9, 2012                *Counsel of Record*

*Continued on next page*

Jim Grant
AGAPE CHURCH, INC.
701 Napa Valley Drive
Little Rock, Arkansas 72211
Tel: 501.225.0612

Philip Hurley
LONDON BROADCASTING COMPANY, INC.
5052 Addison Circle
Addison, Texas 75001
Tel: 214.812.9600

Jane E. Mago
Jerianne Timmerman
Erin Dozier
NATIONAL ASSOCIATION
    OF BROADCASTERS
1771 N Street NW
Washington DC 20036
Tel: 202.429.5430

Terence Crosby
UNA VEZ MAS, LP
703 McKinney Avenue
Suite 240
Dallas, Texas 75202
Tel: 214.754.7008

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

The undersigned attorney of record, in accordance with D.C. Cir. R. 28(a)(1), hereby certifies as follows:

### A.    <u>Parties and Amici</u>

The parties to this case are Joint Petitioners Agape Church, Inc. ("Agape"), London Broadcasting Company, Inc. ("London"), the National Association of Broadcasters ("NAB"), and Una Vez Mas, LP ("UVM"), and Respondents Federal Communications Commission and United States of America.  The National Hispanic Media Coalition ("NHMC") has appeared as an intervenor in support of Joint Petitioners.  National Cable & Telecommunications Association ("NCTA") and Time Warner Cable Inc. ("TWC") have appeared as intervenors in support of Respondents.  As of the date of filing, no amici curiae have appeared in this case.

### B.    <u>Ruling Under Review</u>

Joint Petitioners seek review of the final order of the Federal Communications Commission captioned *Carriage of Digital Television Broadcast Signals:  Amendment to Part 76 of the Commission's Rules*, Fifth Report and Order, CS Docket No. 98-120, FCC 12-59 (rel. June 12, 2012) ("*Order*").  The Order was published in the Federal Register on June 18, 2012.  77 Fed. Reg. 36178.

C.     **<u>Related Cases</u>**

The case on review was not previously before this Court or any other court. Undersigned counsel are not aware of any other cases pending in this Court or any other court that raise issues substantially the same as, or similar to, the issues to be raised in this case.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, Joint Petitioners Agape, London, NAB and UVM hereby submit the following corporate disclosure statements:

Agape Church, Inc. is an Arkansas nonprofit corporation and the licensee of three broadcast television stations in Arkansas:  KVTN-DT, KVTH-DT, and KVTJ-DT.  It has no parent company, and has not issued any shares or debt securities to the public; thus, no publicly-held company owns ten percent or more of its stock.

London Broadcasting Company, Inc. is a Delaware for-profit corporation with its principal place of business in Addison, Texas.  Its parent company is SunTx LBC Holdings, LP, which has a 75% ownership interest.  The parent companies of SunTX LBC Holdings, LP are SunTx Capital Partners II, LP, which has a 33% ownership interest, SunTx Capital Partners II Dutch Investors, LP, which has an 18% ownership interest, Thrivent White Rose Fund II Equity Direct, LP, which has a 30% ownership interest, and SunTx Capital Partners II GP, LP, which has a 100% voting interest.  The parent company of SunTX Capital Partners II, LP and SunTx Capital Partners II Dutch Investors, LP is SunTx Capital Partners II GP, LP, which has a 100% voting interest in both companies.  The parent companies of Thrivent White Rose Fund II Equity Direct, LP are Thrivent

Financial for Lutherans, which has a 99% ownership interest, and Thrivent White Rose GP II, LLC, which has a 100% voting interest. The parent company of Thrivent White Rose GP II, LLC is Thrivent Financial for Lutherans, which has a 67% ownership interest and a 100% voting interest. The parent company for SunTx Capital Partners II GP, LP is SunTx Capital II Management Corp., which has a 100% voting interest.

NAB is a nonprofit, incorporated association of radio and television stations and broadcast networks. It has no parent company, and has not issued any shares or debt securities to the public; thus, no publicly-held company owns ten percent or more of its stock. As a continuing association of numerous organizations operated for the purpose of promoting the interests of its membership, the coalition is a trade association for purposes of D.C. Circuit Rule 26.1.

Una Vez Mas, LP is a limited partnership and the parent company of several FCC television broadcast licensees. Its parent companies are Alta UVM Holdings, Inc., which has a 35% ownership interest, and Una Vez Mas GP, LLC, which is the General Partner. The parent company of Alta UVM Holdings, Inc. is Alta Communications IX, L.P., which has a 94.2% ownership interest in Alta UVM Holdings, Inc. The parent company of Alta Communications IX, L.P. is Alta Communications IX Managers, LLC, which has a 100% voting interest in Alta Communications IX, L.P.

## <u>STATEMENT REGARDING JOINT APPENDIX</u>

The parties have conferred and intend to use a deferred joint appendix.

# **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES..........i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

STATEMENT REGARDING JOINT APPENDIX ................................v

TABLE OF AUTHORITIES ................................................. viii

GLOSSARY……................................................................ xii

STATEMENT OF JURISDICTION....................................................1

STATUTES AND REGULATIONS ........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................1

STATEMENT OF FACTS ....................................................2

SUMMARY OF THE ARGUMENT ................................................13

STANDING…..........................................................................18

ARGUMENT ..........................................................................19

I.      STANDARD OF REVIEW.................................................19

II.     THE *ORDER* CONFLICTS WITH CONGRESS'S EXPRESSED
        INTENT ON THE QUESTION OF VIEWABILITY. .................................20

        A.      The *Order* Conflicts With The Text Of Section 614(b)(7)................20

        B.      The FCC's New Reading Of Section 614(b)(7) Is At Odds With
                The Structure Of That Provision. ........................................22

        C.      The Agency's Interpretation Of Section 614(b)(7) Is Inconsistent
                With The Legislative History Of That Provision................................23

        D.      The *Order* Is Incompatible With The Primary Objectives Of The
                Must-Carry Regime..........................................................25

        E.      The Agency's Interpretation Is Inconsistent With
                Section 614(b)(7) When Read In Context Of The Overall
                Statutory Scheme Of The Cable Act................................................27

III.    THE *ORDER* IS NOT BASED ON A PERMISSIBLE READING OF
        SECTION 614(b)(7). ..........................................................30

IV.     THE *ORDER* IS ARBITRARY AND CAPRICIOUS. ................................35

        A.      The *Order* Abruptly Departs From Settled Agency Precedent..........35

        B.      The Agency Arbitrarily Ignored Record Evidence Supporting
                Extension Of The Viewability Rule....................................39

C.    The Commission's Conclusion That "Affordable" DTAs
      Are Readily Available Is Contrary To Record Evidence....................42

D.    The *Order* Irrationally Failed To Consider The One-Third
      Spectrum Capacity Cap.......................................................................44

E.    The Commission Irrationally Concluded That A Six Month
      Transition Period Is Adequate...........................................................47

V.    THE FCC FAILED TO PROVIDE ADEQUATE NOTICE THAT IT
      WAS CONTEMPLATING EQUIPMENT-BASED ALTERNATIVES. ....51

## TABLE OF AUTHORITIES

### FEDERAL CASES

*American Medical Ass'n v. Reno*,
  57 F.3d 1129 (D.C. Cir. 1995)..........................................................52

*Animal Legal Defense Fund, Inc. v. Glickman*,
  204 F.3d 229 (D.C. Cir. 2000)..........................................................34

*Bell Atlantic Telephone Cos. v. FCC*,
  131 F.3d 1044 (D.C. Cir. 1997)........................................................19

*Business Roundtable v. SEC*,
  647 F.3d 1144 (D.C. Cir. 2011)........................................................44

\* *Chevron U.S.A., Inc. v. Natural Resources Defense Council*,
  467 U.S. 837 (1984)................................................................19, 31

*Coalition for Responsible Regulation, Inc. v. EPA*,
  684 F.3d 102 (D.C. Cir. 2012)..........................................................21

*Donnelly v. FAA*,
  411 F.3d 267 (D.C. Cir. 2005)..........................................................22

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)....................................................................38

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)..............................................................26-27, 30

*Lead Industries Ass'n v. EPA*,
  647 F.2d 1130 (D.C. Cir. 1980)........................................................20

*Lopez v. Davis*,
  531 U.S. 230 (2001)....................................................................21

\* *Motor Vehicle Manufacturers Ass'n v. State Farm*
  *Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)...................................42

\* Authorities upon which we chiefly rely are marked with an asterisk.

*Northpoint Technology Ltd. v. FCC*,
    412 F.3d 145 (D.C. Cir. 2005)............................................................31

*PPL Wallingford Energy LLC v. FERC*,
    419 F.3d 1194 (D.C. Cir. 2005).....................................................44, 47

*Rural Cellular Ass'n v. FCC*,
    588 F.3d 1095 (D.C. Cir. 2009)........................................................51

*Safe Extensions, Inc. v. FAA*,
    509 F.3d 593 (D.C. Cir. 2007).........................................................42

*Shell Oil Co. v. EPA*,
    950 F.2d 741 (D.C. Cir. 1991).........................................................52

*Small Refiner Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983).........................................................52

*Time Warner Entertainment Co., L.P. v. FCC*,
    240 F.3d 1126 (D.C. Cir. 2001).......................................................28

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)....................................................................22

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994)..................................................................25

*Turner Broadcasting System, Inc. v. FCC*,
    520 U.S. 180 (1997)..................................................................25

*United States Telecom Ass'n v. FCC*,
    227 F.3d 450 (D.C. Cir. 2000).........................................................42

*Verizon Telephone Cos. v. FCC*,
    570 F.3d 294 (D.C. Cir. 2009).........................................................38

*Village of Barrington, Illinois v. Surface Transporation Board*,
    636 F.3d 650 (D.C. Cir. 2011).........................................................31

## FEDERAL STATUTES

5 U.S.C. § 553.............................................................................51

5 U.S.C. § 706.................................................................................20

28 U.S.C. §2344...............................................................................1

47 U.S.C. § 151 *et seq.*......................................................................2

47 U.S.C. § 309............................................................................4, 48

47 U.S.C. § 325..................................................................................3

47 U.S.C. § 338................................................................................29

47 U.S.C. § 402..................................................................................1

47 U.S.C. § 521 note.........................................................................32

\* 47 U.S.C. § 534....................................... 3, 4, 13, 14, 21, 22, 28, 29, 45

47 U.S.C. § 535..................................................................................3

Pub. L. No. 109-171, 20 Stat. 4 (2006)...........................................4, 48

Pub. L. No. 111-4, 123 Stat. 112 (2009).............................................49

## LEGISLATIVE MATERIALS

\* H.R. Rep. No. 102-628 (1992)................................... 2, 3, 23, 24, 25, 26, 27

\* S. Rep. No. 102-92 (1991) ...........................................2, 3, 23, 24, 25, 29

## ADMINISTRATIVE MATERIALS

*Advanced Television Systems and Their Impact Upon the Existing Television Broadcast Service*, Fifth Report and Order, 12 FCC Rcd 12809 (1997) ......4, 48

*Broadcast Carriage Rules for Satellite Carriers*, 17 FCC Rcd 6065 (2002), *vacated in part by* 22 FCC Rcd 16074 (2007).........29

*Carriage of the Transmissions of Digital Television Broadcast Stations: Amendment to Part 76 of the Commission's Rules*, 13 FCC Rcd 15092 (1998)...........................................................................................4, 26

*Carriage of Digital Television Broadcast Signals:*
    *Amendment to Part 76 of the Commission's Rules*,
    22 FCC Rcd 21064 (2007)................................................ 5, 6, 12, 26, 37, 39, 46

*Carriage of Digital Television Broadcast Signals:*
    *Amendment to Part 76 of the Commission's Rules*,
    27 FCC Rcd 1713 (2012).......................................... 6, 12, 18, 21, 37, 39, 46, 52

*Matter of DTV Consumer Education Initiative*,
    Report and Order, 23 FCC Rcd 4134 (2008).....................................................48

*Implementation of the Cable Television Consumer Protection and
    Competition Act of 1992*, 8 FCC Rcd 2965 (1993) ......................................36, 37

*Implementation of the Cable Television Consumer Protection and
    Competition Act of 1992*, 9 FCC Rcd 6723 (1994) ............................... 26, 36-37

Press Release, FCC, FCC Continues DTV Outreach Across the Nation:
    Call Center Receives Over 900,000 Calls in Days Surrounding
    Transition (June 15, 2009) ................................................................................49

Public Notice, *Media Bureau Announces Effective Date for the Rules in the
    DTV Consumer Education Initiative*, 23 FCC Rcd 8410 (2008)................. 48-49

# **GLOSSARY**

| | |
|---|---|
| *2007 Order* | FCC order released on November 30, 2007 adopting the viewability rule |
| Act | Communications Act of 1934, as amended |
| All-Digital Cable System | A cable system that transmits programming in digital format only |
| Cable Act | Cable Television Consumer Protection and Competition Act of 1992 |
| DTV Transition | Digital television transition; the transition from analog to digital broadcasting completed on June 12, 2009 |
| Hybrid Cable System | A cable system that offers both an analog and a digital tier of service |
| *Order* | FCC order released on June 12, 2012 repealing the viewability rule |
| *Turner I* | 1994 Supreme Court opinion upholding the must-carry provisions of the Cable Act |
| *Turner II* | 1997 Supreme Court opinion upholding the must-carry provisions of the Cable Act |
| Viewability Rule | A rule that required operators of hybrid or analog cable systems to carry digital must-carry signals in analog format |

## STATEMENT OF JURISDICTION

This Court has jurisdiction over Joint Petitioners' challenge under 47 U.S.C. § 402(a).  Joint Petitioners' Petition for Review was timely filed within the 60-day period under 28 U.S.C. § 2344.  Petition for Review, *Agape Church, Inc. v. FCC*, No. 12-1334 (D.C. Cir. filed July 31, 2012).

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in an addendum to this brief.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether the *Order* exceeds the Commission's statutory authority.

2.    Whether the *Order* is arbitrary, capricious, and an abuse of discretion within the meaning of the Administrative Procedure Act.

3.    Whether the *Order* is otherwise contrary to law.

## STATEMENT OF FACTS

1.  In 1992, Congress enacted the Cable Television Consumer Protection and Competition Act ("Cable Act").  One of the fundamental purposes of the Cable Act was to provide broadcast television stations with certain carriage rights on cable systems.  Congress recognized that, over time, cable systems had become the gateway to viewers, and that local broadcast stations depended on an "'open gate'" for access to viewers, but cable operators possessed incentives to disfavor broadcasters.  S. Rep. No. 102-92, at 42 (1991).  Animated by the concern that cable operators would impose adverse terms of carriage on local television stations with potentially "enormous consequences" to the American public and its broadcasting system, *id.* at 45-46, Congress adopted various provisions to ensure a level playing field.  Congress's primary objectives were threefold—to preserve the benefits of over-the-air local broadcast television, to promote diversity of views and information, and to ensure fair competition in the video programming market. *See, e.g.*, H.R. Rep. No. 102-628, at 50-51 (1992); S. Rep. No. 102-92, at 42.[1]

Consistent with these critical national objectives, the Cable Act added a new Section 614 to the Communications Act requiring cable television systems to dedicate some of their channels to local broadcast television stations, creating so-

---

[1] The Cable Act amended the Communications Act of 1934, 47 U.S.C. § 151, *et seq.* (the "Act") in various respects.

called "must carry" rights for stations electing such mandatory carriage.  *See* 47 U.S.C. §§ 534-35.[2]  Of particular relevance here, Section 614(b)(7) provides that must-carry broadcast signals "*shall be viewable via cable on all television receivers of a subscriber which are connected to a cable system* by a cable operator or for which a cable operator provides a connection."  47 U.S.C. § 534(b)(7) (emphasis added).  Section 614 further requires cable operators to meet these carriage obligations without discriminating against or among local broadcast stations in terms of the "quality of signal processing and carriage" that they receive vis-à-vis any other type of signal.  *Id.* § 534(b)(4).  To ensure achievement of these goals, Congress meant for must-carry stations to be viewable "*without added equipment*."  S. Rep. No. 102-92, at 44, 45 (emphasis added); *accord* H.R. Rep. No. 102-628, at 55.  And, recognizing the need to balance the goal of guaranteeing carriage for local television signals with avoiding undue burdens on cable operators, Congress provided that cable operators need only dedicate up to one-third of their usable activated channels to must-carry signals.  47 U.S.C. § 534(b)(1)(B).[3]

---

[2] Stations that do not elect to be carried pursuant to the must-carry regime are carried on cable systems pursuant to individually negotiated "retransmission consent" agreements.  *Id.* § 325(b)(1)(A).

[3] This provision applies to operators of cable systems having more than 12 usable activated channels, *i.e.*, most cable operators today.  *Id.*  Smaller cable systems need only carry either three local broadcast signals or, if they have less than 300

3

2.  The advent of digital television ("DTV") brought new challenges to the continued fulfillment of the Cable Act's objectives.  Local television stations traditionally broadcast in analog format, but in 1997 Congress and the FCC adopted plans to transition the broadcast industry from analog to digital technology, setting December 31, 2006 as the initial target deadline for the transition.  *Advanced Television Systems and Their Impact Upon the Existing Television Broadcast Service*, Fifth Report and Order, 12 FCC Rcd 12809, 12850 (¶ 99) (1997) ("*DTV Fifth Report and Order*"); 47 U.S.C. § 309(j)(14)(B) (2004). Congress later enacted legislation setting February 17, 2009 as the "hard date" for the digital transition.  Digital Television Transition and Public Safety Act of 2005, Pub. L. No. 109-171, § 3002, 120 Stat. 4, 21 (2006) (codified at 47 U.S.C. § 309 note).  At the same time, cable operators remained free to transition from analog to digital services, or to offer both services, on a voluntary basis.

In 1998, the FCC initiated a rulemaking to ensure that cable operators that had not completed their own digital conversion would continue to meet their statutory must-carry obligations.  *Carriage of the Transmissions of Digital Television Broadcast Stations: Amendments to Part 76 of the Commission's Rules*, 13 FCC Rcd 15092, 15093 (¶¶ 1-2) (1998) ("*First DTV Must Carry NPRM*").  The

---

subscribers, simply may not discontinue carriage of any such signal that they were already carrying when the Cable Act was enacted.  *Id.* § 534(b)(1)(A).

agency recognized the importance of continuing to serve the Cable Act's objectives during and after the DTV transition.  *Id*. at 15093 (¶ 1).

3.  Nearly ten years later, as the end of the DTV transition approached, the Commission adopted a rule requiring cable operators that persist in offering analog cable service in addition to digital service (so-called "hybrid" service) to carry digital must-carry signals in analog format.  *Carriage of Digital Television Broadcast Signals:  Amendment to Part 76 of the Commission's Rules*, 22 FCC Rcd 21064, 21070 (¶ 15) (2007) ("*2007 Order*") (JA__).  This "viewability rule" was needed to ensure that *all* cable subscribers could access must-carry channels seamlessly and without additional equipment.  As the agency explained, the rule was necessary because without it "the signals of must-carry stations w[ould] be completely unavailable to analog cable subscribers" following the transition.  *Id*. at 21091 (¶ 55) (JA__).

The FCC relied on "a straightforward reading of the relevant statutory text" and "the structure of the provision" to hold that the statute unambiguously required that signals be "*actually viewable*" by analog cable subscribers.  *Id.* at 21073-74 (¶ 22) (JA__).  It rejected cable operators' arguments that an "offer" of equipment to these subscribers could satisfy the viewability mandate as being "at odds with . . . the plain meaning" of Section 614 because "the broadcast signals in question are not 'viewable' on their receivers" without equipment.  *Id.* at 21073 (¶ 22) (JA__).

5

The viewability rule presented cable operators with two choices: (1) carry must-carry signals in analog format to all analog households, or (2) transition to all-digital systems and carry those signals in digital format, while ensuring that subscribers with analog sets had the equipment necessary to view them. *Id.* at 21071 (¶ 17) (JA__). The agency noted that "virtually all cable operators ultimately will" transition to all-digital systems, *id.* at 21072 (¶ 20) (JA__), and that this transition would obviate their need to carry digital signals in analog format, *id.* at 21070 (¶ 15) (JA__).[4] The rule was thus made effective for a period of three years from June 12, 2009 (the end of the DTV transition), subject to review "in light of the potential cost and service disruption to consumers, and the state of technology and the marketplace." *Id*. at 21070 (¶ 16) (JA__).

4. On February 10, 2012, the Commission released a Notice of Proposed Rulemaking proposing to extend the viewability rule to "June 12, 2015, unless the Commission extends the requirements prior to that date." *Carriage of Digital Television Broadcast Signals: Amendment to Part 76 of the Commission's Rules*, 27 FCC Rcd 1713, 1727 (App. A) (2012) ("*NPRM*") (JA__). There, the FCC sought comment on whether to extend the rule for an additional period of time to ensure that cable subscribers "with analog equipment[] continue to have access to

---

[4] Recognizing that the status of the cable transition to digital operations would be material to its subsequent consideration of the viewability rule, the Commission announced that it would begin to collect data on, among other things, digital cable penetration. *2007 Order*, 22 FCC Rcd at 21070 n.39 (¶ 16 n.39) (JA__).

must carry television signals." *Id.* at 1714 (¶ 3) (JA__). Echoing the *2007 Order*, the FCC stated that it was "*bound by statute* to ensure that must-carry signals are *actually viewable* by all subscribers." *Id.* at 1715 (¶ 5) (emphasis added) (JA__); *accord id.* (¶ 6) (JA__). It sought comment, among other things, on the pace of cable operators' own transition to digital, which as noted above would eliminate the need for the viewability rule. *Id.* at 1719-20 (¶ 13) (JA__). Notably absent was *any* indication that the agency might consider allowing covered cable operators to comply with their statutory viewability obligations by offering subscribers additional equipment. Instead, the Commission emphasized its previous *rejection* of such proposals because of "the potential, if not . . . certainty, that must-carry signals *would not be viewable* by analog subscribers." *Id.* at 1720 (¶ 14) n.48 (emphasis added) (JA__, __).

Similarly, the *NPRM* acknowledged the existence of several factors underscoring the continued importance of the rule. For example, it recognized that the rule preserves viewership and related revenues for must-carry stations and, in turn, programming options and diversity in media voices for consumers. *Id.* at 1716 (¶ 7) (JA__). The *NPRM* also noted that available evidence indicated that "the viewability requirements remain important to consumers." *Id.* at 1717 (¶ 9) (JA__). In fact, the FCC found that more than *twelve million* households remained wholly reliant on analog cable service, and still more cable subscribers rely in part

7

on analog signals for second (or additional) televisions. *Id.* (JA__). Thus, the agency took note that "sunset . . . would potentially impact millions of subscribers, and the broadcasters who would be unable to reach them." *Id.* at 1718 (¶ 10) (JA__).

5.  Initially filing comments on behalf of the industry, NAB urged extension of the rule for three more years, as the FCC had proposed. *See* Comments of NAB, CS Docket No. 98-120, at 3-6 (Mar. 12, 2012) ("NAB Comments") (JA__); Reply Comments of NAB, CS Docket No. 98-120, at 2-10 (Mar. 22, 2012) ("NAB Reply Comments") (JA__).  A swell of *ex parte* submissions advocating the same result followed press reports—which were neither preceded nor accompanied by *any* FCC notice—indicating that the agency might change course and declare that the viewability rule should no longer be effective as of December 2012. *See, e.g.*, *Ex Parte* Letter from National Religious Broadcasters, CS Docket 98-120, at 1 (Apr. 26, 2012) (JA__); *Ex Parte* Letter from Una Vez Mas, CS Docket No. 98-120, at 1 (Apr. 27, 2012) ("April 27 UVM *Ex Parte*") (JA__); *Ex Parte* Letter from Ion Media Networks, CS Docket No. 98-120, at 1 (Apr. 27, 2012) ("April 27 Ion *Ex Parte*") (JA__); *Ex Parte* Letter from Trinity Broadcasting Network, CS Docket No. 98-120, at 1 (May 24, 2012) (JA__).  These filings explained that the Act plainly requires that all must-carry signals be viewable, and that the equipment-based proposals advanced by cable operators would run afoul of the Act's

8

viewability requirement and non-discrimination provisions, as well as its fundamental purpose. *See, e.g.*, NAB Reply Comments at 4-6 (JA__); *Ex Parte* Letter from NAB, CS Docket No. 98-120, at 2 (June 7, 2012) ("June 7 NAB *Ex Parte*") (JA__).

NAB and broadcasters also argued that, absent extension of the rule, many analog cable households would lose the ability to view must-carry signals, causing must-carry broadcasters to suffer losses in viewership and revenues—particularly given the sizeable number of remaining analog cable households. *See, e.g.*, NAB Comments at 6 (JA__); *Ex Parte* Letter from NAB, CS Docket No. 98-120, at 1 (Apr. 23, 2012) ("April 23 NAB *Ex Parte*") (JA__); *Ex Parte* Letter from NAB, CS Docket No. 98-120, attach. at 5-9 (Apr. 26, 2012) ("April 26 NAB *Ex Parte*") (JA__); June 7 NAB *Ex Parte* at 2-3 (JA__).  Broadcasters emphasized that must-carry stations overwhelmingly serve niche markets, offering religious and foreign language programming and, thus, repeal would most heavily burden unserved and underserved audiences. *See, e.g.*, April 27 UVM *Ex Parte* at 1-2 (JA__); *Ex Parte* Letter from Entravision Holdings, LLC, CS Docket No. 98-120, at 1 (June 4, 2012) ("June 4 Entravision *Ex Parte*") (JA__); *Ex Parte* Letter from Daystar Television Network, CS Docket No. 98-120, at 1 (May 4, 2012) ("May 4 Daystar *Ex Parte*") (JA__); *Ex Parte* Letter from Mapale LLC, CS Docket No. 98-120, at 2 (May 1, 2012) ("May 1 Mapale *Ex Parte*") (JA__).  They noted, in addition, that cable

operators could avoid the need to comply with the viewability rule by transitioning to all-digital operations but that, to date, cable had not completed its own digital transition. *See, e.g.*, NAB Comments at 5-6 (JA__). Broadcasters further commented that the one-third spectrum capacity cap minimizes the burden of compliance with the viewability rule for cable operators, and that no cable system dedicated bandwidth to must-carry even approaching the cap. *See Ex Parte* Letter from Ion Media Networks, CS Docket No. 98-120, at 3 (June 1, 2012) ("June 1 Ion *Ex Parte*") (JA__); April 27 Ion *Ex Parte* at 3 (JA__).

In response to cable operator comments advocating an equipment-based approach, must-carry broadcasters also expressed concerns that such an approach would "raise[] multiple barriers for consumers," June 5 NAB *Ex Parte* at 1 (JA__), including "the trouble and expense of acquiring and installing [equipment] just to obtain access to must-carry stations," June 1 Ion *Ex Parte* at 4 (JA__). Others noted concern that affected viewers would not understand or be aware of the need for additional equipment. *See, e.g.*, *Ex Parte* Letter from Northwest Broadcasting, CS Docket No. 98-120, at 2 (June 5, 2012) ("June 5 Northwest Broadcasting *Ex Parte*") (JA__); *Ex Parte* Letter from National Black Religious Broadcasters, CS Docket No. 98-120, at 2 (June 9, 2012) ("June 9 NBRB *Ex Parte*") (JA__). Overall, broadcasters argued that an equipment-based solution would "erode viewership" of must-carry stations. *E.g.*, *id.* at 3 (JA__). Moreover, the record

10

contained scant evidence that the equipment necessary to permit receipt of must-carry signals by analog subscribers was available at an affordable cost.

Lastly, following news reports that the agency was considering letting the rule expire with only a six-month transition period, broadcasters argued that this time period was insufficient to allow a smooth transition. They emphasized, in particular, the experience with the DTV transition, which had involved a massive government effort—including extensive mandatory and voluntary consumer education campaigns by broadcasters, cable operators, and others—for a period exceeding one year, and still left some viewers unprepared. *See Ex Parte* Letter from NRJ TV, CS Docket No. 98-120, at 1 (June 7, 2012) ("June 7 NRJ TV *Ex Parte*") (JA__); June 5 Northwest Broadcasting *Ex Parte* at 2 (JA__); Entravision June 4, 2012 *Ex Parte* at 2 (JA__); June 1 Ion *Ex Parte* at 6 (JA__).

6. On June 11, 2012, the FCC adopted its *Order*. In a dramatic reversal from the proposal in the *NPRM* to leave the viewability rule in place for three more years, the agency announced the elimination of the rule effective June 12, 2012, and provided a mere six-month period until December 12, 2012, during which cable operators that had not yet transitioned to all-digital operations would continue to be required to carry must-carry signals in analog format. *Order* ¶ 1 (JA__). In place of the rule, the *Order* accepted an equipment-based approach, under which such cable operators may cease analog carriage of must-carry signals

11

and, instead, require analog subscribers to install additional equipment to view these signals provided that the equipment is affordable. *Id.* (JA__).

To reach this result, the FCC abruptly "reinterpret[ed]" the statute whose meaning it previously found plain. *Id.* ¶ 3 (JA__). In an about-face from its prior determination that Section 614(b)(7) unambiguously precluded an equipment-based solution, *2007 Order*, 22 FCC Rcd at 21073 (¶ 22) (JA__); *see NPRM*, 27 FCC Rcd at 1714-16 (¶¶ 5-6) (JA__), the FCC posited that "the statutory viewability requirement is ambiguous, and reasonably can be read . . . to permit cable operators to require the use of equipment to view must-carry signals" so long as the equipment is "both available and affordable (or provided at no cost)," *Order* ¶ 11 (JA__); *see also id.* ¶ 8 (JA__). The Commission concluded that repeal in six months was consistent with the public interest given alleged changes in the marketplace and technology, *id.* ¶¶ 1, 11, 12 (JA__,__, __), even though little, if anything, had changed since issuance of the *NPRM* just four months earlier. In particular, it found that "low-functionality/low cost digital equipment" such as Digital Transport Adaptors ("DTAs") are readily available in an "affordable" range of "no more than $2[,]" a finding the agency deemed "[c]ritical" to justify sunset. *Id.* ¶¶ 14, 17 (JA__, __).

Although characterizing its decision as affording a "six-month transitional period," *id.* ¶ 1 (JA__), the *Order* actually affords the must-carry broadcasters and

12

viewers that will be harmed by elimination of the rule much less time to prepare. This is because the *Order* relies on certain cable operators' voluntary "commit[ment]" to provide affected must-carry stations only 90 days notice, and requires only 30 days notice to affected viewers, before additional equipment becomes necessary to view a must-carry signal.  *Id.* (JA__).[5]  It does not require any specific manner of notice to either affected stations or viewers.  Nor does it adopt any particular measures to ensure consumer awareness of the "transition."

## SUMMARY OF THE ARGUMENT

In this case, Joint Petitioners challenge the Commission's *Order* eliminating its viewability rule.  This rule required cable operators that do not provide all-digital service to carry digital must-carry broadcast signals in analog format in order to satisfy their statutory obligation to make all must-carry signals "viewable."  47 U.S.C. § 534(b)(7).  In its place, the *Order* adopts an equipment-based alternative, allowing such cable operators "flexibility" to cease carriage of analog must-carry signals.  *Order* ¶ 1 (JA__).  It permits cable operators to satisfy the statutory viewability mandate with a mere "offer" of additional equipment, provided that the equipment is "affordable."  But the *Order* rests on a "revised" interpretation of Section 614(b)(7) that cannot be squared with Congress's

---

[5] Not all cable operators made this commitment.  *See Order* ¶ 17 & n.90, n.91 (JA__, __).

unambiguous intent, and is otherwise arbitrary and capricious.  It therefore cannot survive judicial review.

Foremost, Congress spoke to the precise question at issue in the Cable Act, and intended Section 614(b)(7) to require that must-carry signals be actually viewable without added equipment, not merely available in theory.  By its plain terms, Section 614(b)(7) mandates that every cable subscriber "shall" receive a viewable must-carry signal on television sets connected by cable operators.  47 U.S.C. § 534(b)(7).  This ensures that all subscribers can access such signals in the same manner as all other channels on at least one television—the one the cable operator "connect[s]."  *Id.*  For "additional" subscriber-installed receiver, Section 614(b)(7) allows an operator to meet its viewability obligation with an "offer to sell or lease" equipment.  *Id.*  The provision thus mandates viewability, and creates a narrow exception for additional television sets (for which an "offer" of equipment will suffice).  Thus, both the text and the structure of Section 614(b)(7) make clear that must-carry signals must be viewable *without added equipment*.

The legislative history reinforces the conclusion that Congress sought to prevent cable operators from relegating must-carry stations to channels that could not be viewed without added equipment (*i.e.*, equipment *beyond that* required to view other broadcast stations and cable channels).  It also reflects Congress's deliberate rejection of an earlier equipment-based solution as "ineffective," and the

14

need to ensure must-carry broadcasters' access to cable subscribers.  In adopting the must-carry regime, Congress sought to advance three interrelated goals—preserving the benefits of free, over-the-air local broadcast television; promoting diversity and localism; and ensuring fair competition in the market for video programming.  In light of these over-arching objectives, and from the substance of other provisions in the Cable Act, Section 614(b)(7) must be read to preclude an approach that requires the installation and use of intermediating equipment before must-carry stations can be accessed by viewers.

In sum, applying traditional tools of statutory interpretation, Congress directly addressed the precise question at issue and made clear its intent that must-carry signals be actually viewable without additional equipment.  Because the Commission adopted the precise opposite reading of Section 614(b)(7), fidelity to Congressional intent requires invalidation of the *Order*.

Even if this Court were to conclude that Section 614(b)(7) is ambiguous, which it should not, the agency's interpretation is impermissible because the justifications advanced in the *Order* undermine the core objectives of Section 614(b)(7).  By depriving must-carry stations of equal access to the same audience as other stations and non-broadcast channels, the FCC reads Section 614(b)(7) in a manner that permits cable operators to create the very disparate treatment that Congress sought to prevent, thereby turning the statute on its head.

15

The agency contends that the *Order* advances the statutory purpose given the state of technology and current marketplace conditions, but this rests on a logical disconnect. The *Order* does not grapple with the notion that a mere offer of "affordable" or even free equipment does not actually ensure that analog subscribers can view must-carry signals; that equipment must be obtained, installed and, in some cases, paid for by viewers who are often low-income. And it ignores record evidence that its equipment-based rule will harm must-carry broadcasters and the viewing public in the very manner Congress intended to prevent.

The Commission further attempts to justify the *Order* as a means to provide cable operators with greater flexibility to meet the demands of digital subscribers for other, non-must-carry programming, but flexibility for cable operators plainly was not an objective of the Cable Act. Because the Commission failed to explain how its new interpretation is rationally related to the goals of the Cable Act, the *Order* must fail even if the relevant statutory provisions are found to admit of some ambiguity.

Further, the *Order* is arbitrary and capricious for several reasons. *First*, the agency made an about-face on the threshold question of whether Congress spoke directly to the issue of viewability in Section 614(b)(7). *Order* ¶¶ 6, 8, 11, 15 (JA__, __, __, __). Without reasoned explanation, the FCC concluded that the

16

provision it once found "straightforward," and the language of which has not changed, is now unclear.

*Second*, the agency failed to adequately explain why facts that it said, a mere four months before issuance of the *Order*, would support a three-year extension instead support repeal. In particular, the FCC offered no satisfactory rationale to justify elimination of the rule in light of record evidence of the substantial costs of repeal for over twelve million analog cable households, must-carry broadcasters and, in particular, unserved and underserved populations.

*Third*, the Commission's conclusion that DTAs are readily available in an "affordable" range of "no more than $2[,]" *see Order* ¶ 14 (JA__), runs counter to the record. Although "the availability of affordable set-top boxes" was "*[c]ritical*" to the agency's decision to eliminate the rule, *id.* ¶ 17 (JA__), the record evidence is scant on both availability and affordability of DTAs.

*Fourth*, weighing the effect of repeal, the agency arbitrarily failed to consider that the Cable Act's one-third cap on the amount of bandwidth a cable operator could be required to dedicate to must-carry signals already minimized the impact of the rule on cable operators. *Order* ¶ 16 (JA__). Instead, it gave effect to cable operators' arguments that elimination was needed to increase capacity for digital services—a factor entitled to no weight in the analysis, particularly because cable operators can achieve the same efficiencies by transitioning to all-digital,

17

something the FCC has otherwise recognized would produce significant benefits and thus long sought to encourage.

*Fifth*, the agency's conclusion that a six-month "transition" period will allow a "smooth transition" is arbitrary and capricious. The *Order* makes no meaningful effort to explain how a six-month period would be rational in light of past experience with the DTV transition. And, though the *Order* contends that this period will give consumers "sufficient time to make any necessary arrangements," *id.* (JA__), the six-month period is illusory. Broadcasters may receive a mere 90 days voluntary notice from some cable operators, and cable operators must provide only 30 days notice to subscribers.

*Finally*, the *NPRM* expressly reminded parties that the FCC previously rejected equipment-based alternatives as insufficient given "the potential, if not . . . certainty, that must-carry signals would not be viewable by analog subscribers." *NPRM*, 27 FCC Rcd at 1720 (¶ 14) & n.48 (JA__ & __). The *Order* violates the notice requirements of the Administrative Procedure Act ("APA") by adopting that very approach. *Order* ¶ 1 (JA__).

For each of these reasons, the *Order* is unlawful and should be set aside.

## STANDING

Joint Petitioners have the necessary standing to seek review of the *Order*. They or their members are broadcasters that rely on must-carry for cable carriage

18

and, thus, are subject to the *Order*'s elimination of certain must-carry rules and are otherwise adversely affected and substantially aggrieved by the *Order*. Petitioners NAB and UVM actively participated in the proceedings below.

## ARGUMENT

## I.    STANDARD OF REVIEW

The question whether the FCC lawfully interpreted the Cable Act is governed by the two-step *Chevron* framework. At *Chevron* Step One, this Court considers whether "Congress has . . . addressed the precise question at issue" and, if so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 842-43 (1984). To ascertain Congressional intent, this Court "employ[s] traditional tools of statutory construction." *Id.* at 843 n.9. If the statute's text, legislative history, structure and purpose reveal that Congress intended a particular interpretation, then "Congress has expressed its intention [on the] question and deference is not appropriate." *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997). If the Court is unable to ascertain Congress's intent using these modes of statutory construction, it proceeds to *Chevron* Step Two. At Step Two, the FCC's interpretation must be "based on a permissible construction of the statute," *Chevron*, 467 U.S. at 843, and

cannot otherwise be "arbitrary, capricious, or manifestly contrary to the statute," *id*. at 844; *see* 5 U.S.C. § 706(2)(A).

Joint Petitioners' remaining challenges to the *Order* are reviewed under the "arbitrary and capricious" standard of the APA. *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1145 (D.C. Cir. 1980). Under that standard, "a reviewing court does not serve as a mere rubber stamp for agency decisions." *Id.*

## II. THE *ORDER* CONFLICTS WITH CONGRESS'S EXPRESSED INTENT ON THE QUESTION OF VIEWABILITY.

Congress spoke directly to the question of viewability in the Cable Act. Applying traditional tools of statutory construction, it is evident from the plain language and structure of Section 614(b)(7), its legislative history, the essential purpose of the must-carry regime, and the Cable Act's overall statutory scheme that Congress intended that must-carry signals be actually viewable without added equipment. Because the FCC's decision, which, by the agency's own admission, was based on a "new statutory interpretation," *Order* ¶ 15 (JA__), conflicts with Congress's unambiguously expressed intent, the *Order* is unlawful.

### A. The *Order* Conflicts With The Text Of Section 614(b)(7).

The text of the Cable Act speaks to the precise question at issue. Section 614(b)(7) clearly requires that "must-carry" signals be *actually viewable*, not merely available in theory. It provides:

[Signals] carried in fulfillment of the requirements of this section *shall*

20

*be provided to every subscriber* of a cable system.  Such signals *shall be viewable via cable on all television receivers of a subscriber* which are connected to a cable system by a cable operator or for which a cable operator provides a connection.  If a cable operator authorizes subscribers to install *additional receiver connections*, but *does not provide* the subscriber with such connections, or with the equipment and materials for such connections, the operator . . . shall offer to sell or lease such a converter box to such subscribers at rates in accordance with section 543(b)(3) of this title.

47 U.S.C. § 534(b)(7) (emphases added).

"Congress use[s] 'shall' to impose discretionless obligations."  *Lopez v. Davis*, 531 U.S. 230, 241 (2001); *accord Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 126 (D.C. Cir. 2012).  In no uncertain terms, then, this Section mandates that must-carry signals be actually viewable.  The *Order* falls short of this legal standard, adopting a regime that, at best, ensures only that cable operators that have not yet transitioned to all-digital will *offer* consumers the ability to make signals viewable on analog receivers using additional purchased or leased equipment.  *Order* ¶ 8 (JA__) (stating that cable operators may comply with the statutory viewability requirement by "offering the necessary equipment for sale or lease").  Under this regime, analog subscribers may be required to obtain, pay for, and install additional equipment to receive must-carry signals.  As the FCC recognized in its *NPRM*, this regime creates "the potential, if not a certainty, that must-carry signals would not be viewable by analog subscribers," *NPRM*, 27 FCC Rcd at 1720 (¶ 14) n.48 (JA__)—a result that contravenes the plain statutory terms.

21

**B.**  **The FCC's New Reading Of Section 614(b)(7) Is At Odds With The Structure Of That Provision.**

The Commission's new interpretation conflicts with the statutory structure as well because it renders the distinction between the second and third sentences of Section 614(b)(7) meaningless.  The second sentence mandates that must-carry signals "be viewable via cable on all television receivers of a subscriber which are connected to a cable system" by a cable operator.  47 U.S.C. § 534(b)(7).  That requirement ensures that all subscribers can access must-carry stations in the same manner as all other channels on at least one television—the one the cable operator "connect[s]."  *Id*.  By contrast, the third sentence creates a narrow exception, allowing an operator to meet its viewability obligation with an "offer to sell or lease" equipment only for "additional" subscriber-installed receivers.  *Id*.

It is fundamental that "'[a] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal citation omitted); *accord Donnelly v. FAA*, 411 F.3d 267, 271 (D.C. Cir. 2005) ("We must strive to interpret a statute to give meaning to every clause and word.").  Ignoring this principle, the agency conflated the exception (for television sets not connected by cable operators) with the general rule of viewability by concluding that a mere "offer" of equipment can ensure viewability with respect to *all sets* used to receive cable.

22

### C.  The Agency's Interpretation Of Section 614(b)(7) Is Inconsistent With The Legislative History Of That Provision.

The agency's interpretation also conflicts with the legislative history of Section 614.  The legislative history underscores that an "offer" of added equipment is sufficient to meet the statutory viewability requirement only where the cable operator does not provide the connection for the television set with which the equipment will be used.  In particular, the Senate Report states:

> If the cable operator installs wires for connection to a television set or provides materials to connect a television set to the cable system, it must ensure that all must carry signals can be viewed on that set.  If, *however*, the cable system authorizes subscribers to connect additional receivers, but *neither provides the connections nor the equipment or material needed for such connections*, its *only* obligation is to notify subscribers of any broadcast stations carried on the cable system which cannot be viewed via cable without a converter box, and to offer to sell or lease such a converter at reasonable rates.

S. Rep. No. 102-92, at 86 (emphasis added); *accord* H.R. Rep. No. 102-628, at 94-95.  Thus, the legislative history confirms that the Act requires more with respect to television sets connected by a cable operator.

More broadly, the legislative record reflects Congress's concern that cable operators would impose terms of carriage on must-carry stations with potentially "enormous consequences" to viewers and to the "American system of broadcasting."  S. Rep. No. 102-92, at 45-46.  Among such terms of carriage, in particular, the Senate Report explained that the Act was intended to prevent cable operators from carrying local broadcast signals "on a channel . . . that subscribers

23

. . . cannot view *without added equipment*." *Id.* at 45 (emphasis added). Similarly, the House Report concluded that "the substantial governmental interest in promoting competition in the video marketplace will be threatened if cable systems have unfettered discretion to . . . carry [local broadcast signals] in a disadvantageous manner." H.R. Rep. No. 102-628, at 51. The Committee cited with approval testimony that a local signal repositioned onto a channel that could not be received without additional equipment was "not viewable via cable on these television sets." *Id.* at 55 (quoting Testimony of Preston Padden, *Cable Television: Hearings before the Subcomm. on Telecomms. and Finance of the H. Comm. on Energy and Commerce* (1988)). Section 614(b)(7) ultimately incorporated the "viewable via cable" language cited by the Committee.

The legislative history further reflects Congress's deliberate rejection of another equipment-based solution to viewability, *i.e.*, the A/B input selector switch, as "ineffective," and its view that must-carry rules are "the only means" of ensuring that cable subscribers have access to must-carry signals. S. Rep. No. 102-92, at 45; *see also* H.R. Rep. No. 102-628, at 54 (finding that A/B switches "are cumbersome, often ineffective, troublesome to install and operate, and are unacceptable to consumers"); Cable Act § 2(a)(18) ("A Government mandate for a substantial societal investment in alternative distribution systems for cable subscribers, such as the 'A/B' input selector antenna system, . . . is not in the

24

public interest.").[6]  This history confirms Congress's intent that must-carry signals be viewable without added equipment, but the *Order* creates precisely the opposite result.

### D.  The *Order* Is Incompatible With The Primary Objectives Of The Must-Carry Regime.

The fundamental purpose of the must-carry regime also precludes the FCC's interpretation of Section 614(b)(7).  As the Supreme Court has recognized, Congress enacted the must-carry requirements to "serve three interrelated interests: (1) preserving the benefits of free, over-the-air local broadcast television; (2) promoting the widespread dissemination of information from a multiplicity of sources; and (3) promoting fair competition in the market for television programming."  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994) ("*Turner I*") (citing S. Rep. No. 102-92, at 58; H.R. Rep. No. 102-628, at 63; Cable Act §§ 2(a)(8)-(10)); *accord Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 191-94 (1997) ("*Turner II*").  These interrelated goals are evident throughout the Cable Act's provisions and history.  *See, e.g.*, Cable Act §§ 2(a)(4), 2(a)(12), 2(b)(1); H.R. Rep. No. 102-628, at 63, 67, 77; S. Rep. No. 102-92, at 56, 60.  Responding to record evidence of the harms suffered by local broadcasters denied carriage,

---

[6] The "A/B" input selector switch was a piece of equipment that could be installed to "permit viewers to switch between the cable system and the over-the-air broadcast transmission," S. Rep. No. 102-92, at 40, by flipping a switch from "A" to "B."

25

Congress sought to advance its interrelated interests by ensuring equal access for must-carry broadcasters to the same audience as other program suppliers. *See* Cable Act § 2(b)(5); H.R. Rep. No. 102-628, at 51-52.

FCC precedent, moreover, demonstrates that the agency understands and has historically sought to advance these fundamental aims. In one of its earliest orders on must-carry, the agency described the "goals at the heart of Section[] 614" to include "plac[ing] local broadcasters on a more even competitive level and thus help[ing to] preserve local broadcast service to the public." *Implementation of the Cable Television Consumer Protection and Competition Act of 1992*, 9 FCC Rcd 6723, 6745 (¶ 104) (1994) ("*1994 Memorandum Opinion and Order*"). The FCC's first rulemaking notice on DTV must-carry emphasized Section 614's purposes to ensure the "continued availability of free over-the-air television broadcast service" and "the benefits derived from the local origination of programming." *First DTV Must Carry NPRM*, 13 FCC Rcd at 15096 (¶ 5). And, in its *2007 Order* adopting the viewability rule, the Commission acknowledged that Congress sought to preserve free, over-the-air broadcast television and to "'promot[e] the widespread dissemination of information from a multiplicity of sources'" in enacting the must-carry provisions. *2007 Order*, 22 FCC Rcd at 21090-93 (¶¶ 54-55).

Yet, the *Order* on review directly conflicts with Congress's objectives in enacting must-carry in several respects. Foremost, it disadvantages the

26

broadcasters that rely on must-carry for cable carriage.  Such broadcasters stand to

suffer lost viewership, reduced audience share and, by extension, lost advertising

revenues if the repeal takes effect, *see supra* at 9—the very same harms that

prompted Congress to enact the must-carry regime, *see* H.R. Rep. No. 102-628, at

51-52.  The *Order* also threatens the availability of diverse and local programming.

Lost viewership and revenues will leave must-carry broadcasters hamstrung in

developing and launching new programming, and may even require reductions in

existing programming.   And, because must-carry stations tend to serve niche

markets, repeal will most heavily burden the stations that deliver programming to

unserved and underserved audiences and their viewers.  *See supra* at 9.  Lastly, the

*Order* will create an unequal playing field in the video programming market,

placing must-carry broadcasters at a competitive disadvantage vis-à-vis their

programming competitors (both broadcast and non-broadcast) that have the

bargaining power to insist that their signals and programming remain viewable

without added equipment.

### E.   The Agency's Interpretation Is Inconsistent With Section 614(b)(7) When Read In Context Of The Overall Statutory Scheme Of The Cable Act.

Further, the *Order* cannot be squared with other provisions in the Cable Act.

"It is a 'fundamental canon of statutory construction that the words of a statute

must be read in their context and with a view to their place in the overall statutory

scheme.'" *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 133 (2000). "A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'" *Id.* Reading Section 614(b)(7) in context, as one part of a "harmonious whole" in the Cable Act, Congress plainly intended a particular interpretation—*i.e.*, that must-carry signals be actually viewable without added equipment.

As this Court has recognized, "[t]he 'interrelated interests' of promoting diversity and fair competition run throughout the 1992 Cable Act's various provisions," and "various behavioral rules" were adopted to promote these interests. *Time Warner Entm't Co., L.P. v. FCC*, 240 F.3d 1126, 1136 & n.8 (D.C. Cir. 2001). One such requirement, Section 614(b)(4)(A), prohibits discriminatory treatment of must-carry signals. In particular, it directs the Commission to ensure that "the quality of signal processing and carriage provided by a cable system for the carriage of local commercial television stations will be *no less than that provided by the system for carriage of any other type of signal*." 47 U.S.C. § 534(b)(4)(A) (emphasis added). The *Order* runs afoul of this provision by allowing cable operators to provide better carriage conditions—*i.e.*, a viewable format—for some signals than they do for others. In particular, cable channels and some broadcast channels (including those governed by retransmission consent agreements that do not depend on the viewability rule) will remain fully accessible

28

without added equipment.   In contrast, cable operators can require analog subscribers to pay for DTAs to view certain must-carry stations and have discretion to select which stations are subject to this disadvantage.  It is precisely this type of power to discriminate among stations that Congress sought to remedy when adopting provisions addressing both cable "carriage" and "the terms of carriage."  S. Rep. No. 102-92, at 45-46.

The *Order* ignored the statutory bar on discrimination in the "*quality* of . . . carriage* provided," and instead addressed only "nondegradation" and "technical specifications" of signal quality.   *Compare Order* ¶ 10 (JA__) *with* 47 U.S.C. § 534(b)(4)(A) (emphases added).   But a station that is viewable only after a subscriber installs additional equipment is not receiving "carriage" of equivalent "quality" as a station that is viewable either with no equipment at all or via a standard converter box.[7]  And, in any event, record evidence suggests that low-cost DTAs of the nature contemplated in the *Order* provide signals of an inferior technical quality.  *See Ex Parte* Letter from NAB, CS Docket No. 98-120, at 2

---

[7] The FCC recognized as much when it rejected a similar scheme proposed in the satellite context as violative of Section 338's non-discrimination mandate.  *See Broadcast Carriage Rules for Satellite Carriers*, 17 FCC Rcd 6065, 6078 (¶ 23) (2002), *vacated in part by* 22 FCC Rcd 16074 (2007) ("*EchoStar Order*").  There, the agency found that a satellite provider's plan to require that subscribers install a second dish to view all must-carry signals "result[ed] in discrimination based on price[.]"  *Id*. at 6078 (¶ 23).  The Communications Act expressly requires the nondiscrimination obligations imposed under Section 338 to be "comparable" to those that apply under Section 614(b)(4).  47 U.S.C. § 338(j).

(June 8, 2012) ("June 8 NAB *Ex Parte*") (JA__) (raising concern that a website referenced in NCTA's Comments admits that "DTAs have '[n]o direct output – only 'VCR-like' Channel 3 output (bad quality)' and recommends that consumers accept the DTAs offered and connect them to sets 'that do not get used very often'"); *accord* June 9 NBRB *Ex Parte* at 4 (JA__) (same). The interpretation of Section 614(b)(7) adopted in the *Order* conflicts with Section 614(b)(4)(A)'s independent prohibition on discriminatory carriage and, thus, violates the principle that all parts of a statute must fit into one harmonious whole. *See Brown & Williamson*, 529 U.S. at 133.

In sum, Section 614(b)(7)'s text and structure, its legislative history and purpose, and the overall statutory scheme of the Cable Act all reveal that Congress unambiguously intended that must-carry signals be actually viewable without added equipment. For that reason, the FCC's directly contrary reading of the statute, which interposes serious practical barriers to viewability for analog cable subscribers, cannot be sustained.

## III.    THE *ORDER* IS NOT BASED ON A PERMISSIBLE READING OF SECTION 614(B)(7).

As shown above, Congress addressed the question at issue here when it enacted Section 614(b)(7) of the Cable Act, mandating that must-carry signals be viewable without added equipment. *See supra* Section II. Because the *Order* conflicts with Congress's intent, this Court need not reach *Chevron* Step Two. If

30

this Court concludes that Section 614(b)(7) is ambiguous, however, the Court must consider whether the agency's interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. In so doing, the Court "defer[s] to the agency's permissible interpretation, but only if the agency has offered a reasoned explanation for why it chose that interpretation." *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011). "[C]onsidering only the rationales the [agency] actually offered in its decision," this Court "determine[s] whether its interpretation is 'rationally related to the goals of' the statute." *Id*. at 660; *accord Northpoint Tech. Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005) ("A 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made."). So even if Congress had left some gap-filling role for the FCC here, deference would be inappropriate because the agency's interpretation does not reflect a reasonable choice.

The Commission's justifications for the *Order* are not rationally related to the objectives of the must-carry regime. The Cable Act as a whole, and Section 614(b)(7) specifically, envision that must-carry signals would be on equal footing with other signals and channels. The statute reflects Congress's concern for local stations, especially smaller ones, and their viewers. Congress's directive was guided by findings including that (1) cable systems had the incentives and means

31

to disadvantage local television stations by denying or degrading their carriage; (2) stations so disadvantaged would lose viewership and advertising revenues; and (3) such stations would consequently reduce critical local programming and services, or even cease operating all together.  Cable Act §§ 2(a)(5), (11)-(16) (codified at 47 U.S.C. § 521 nt.).  This is why the statute specifically directed the FCC to *ensure* the carriage and viewability of local signals.

The FCC's reinterpretation of the term "viewability" turns Congress's rationale for the statute on its head.  Instead of concern for stations and viewers, the Commission now suggests that the interests of cable operators are paramount. *See, e.g.*, *Order* ¶¶ 1, 16, 18 (JA__, __, __).  Thus, while asserting that the statute only required "practical" access, *id.* ¶ 8 (JA__), it permits cable operators to create the very disparity of treatment that Congress sought to prevent.  It simply cannot be said that potentially requiring 12 million-plus cable subscribers to take further steps and incur additional expense to view local must-carry signals places those stations on equal footing with other local television stations and non-broadcast channels.  Consumers would be required to learn about the need for new equipment, obtain and likely pay for the additional equipment, and correctly install the equipment to continue viewing must-carry signals.  In contrast, they need do nothing to continue receiving other stations and non-broadcast channels.  This disparity does not square with the language, intent or purpose of the statute.

32

The FCC contends that its newly revised interpretation "effectuates statutory purpose in light of current marketplace conditions," *id.* ¶ 11 (JA__), and the state of technology, *see, e.g.*, *id.* ¶¶ 8, 11-13 (JA__, __-__).  Finding that "an affordable set-top box option, that will achieve the same viewability, is readily available to consumers," the FCC concluded that the "record lacks evidence" that the viewability rule remains "necessary to protect the viability of over-the-air broadcasting" or "availability or quality of broadcast programming." *Id.* ¶ 11 (JA__).  Ignoring statutory language, legislative history and congressional findings to the contrary, the FCC's analysis, in effect, required stations and viewers to *prove* that the disparate treatment proposed by the cable operators would be harmful.

To reach this result, the agency relies on conjecture, a misreading of the record and, at bottom, the mistaken notion that the facts that prompted the agency to adopt the viewability rule in the first place have materially changed since the conclusion of the DTV transition.  The FCC's justification ignores that cable operators remain free to elect to provide analog or digital service, while must-carry broadcasters have transitioned (as mandated by Congress) to digital.  Just as in 2007, must-carry broadcasters reach the vast majority of their viewing audience through cable carriage and, as then, cable operators still have not completed their transition to digital.  And just as in 2007, cable operators are free to ensure that all

broadcast signals are viewable by all subscribers by transitioning to all-digital operations, a result that the FCC has otherwise found would produce substantial benefits and, accordingly, sought to encourage.

The *Order* undermines the fundamental goal of Section 614 to ensure the viewability of must-carry stations by allowing cable operators that have decided not to complete their own transition to digital service simply to drop analog must-carry signals now delivered to more than 12 million analog viewers. *See supra* at 23-25. Though the agency posits that "an affordable set-top box option . . . will achieve the same viewability" as the rule it repealed, *Order* ¶ 11 (JA__), this ignores the fact that an *offer* of low-cost (or even free) DTAs does not "ensure" viewability. Analog subscribers will be unable to view must-carry signals if they do not *accept* and *implement* the offer and, in the case of "low-cost" DTAs, pay for them. As a result, must-carry broadcasters and the viewing public will suffer the very harms that Congress sought to prevent in enacting the must-carry regime. *See supra* at 25-27.[8]

_____

[8]   As this Court has recognized, *Chevron* Step Two analysis overlaps in some circumstances with the "arbitrary and capricious" inquiry. *Animal Legal Def. Fund, Inc. v. Glickman*, 204 F.3d 229, 234 (D.C. Cir. 2000). In this case, the Commission's interpretation of Section 614(b)(7) is unreasonable because it will not ensure actual viewability, particularly given the hurdles to deploying an equipment-based solution, the short transition period, and the lack of any consumer education to inform millions of subscribers of the need to take action. *See* Section 47-51, *infra*.

Further, the agency asserts that its new interpretation will provide greater flexibility to cable operators and that such flexibility will help operators meet the demands of digital subscribers during their transition to all-digital systems.  *See, e.g.*, *Order* ¶¶ 1, 16, 18 (JA__, __, __).  But flexibility for cable operators was not one of Congress's objectives in enacting the must-carry regime.  Instead, Congress sought to prevent cable operators from exercising their power as gate-way providers to the competitive disadvantage of must-carry broadcasters and to the ultimate detriment of the viewing public.  *See supra* at 25-27.  The justification that the FCC offered is not rationally related to the goals of Section 614(b)(7), and the Cable Act generally, to preserve over-the-air broadcasting, promote diverse local service, and ensure fair competition in the video programming market.

In sum, to the extent this Court proceeds to *Chevron* Step Two, it should reject the agency's interpretation of Section 614(b)(7) as unreasonable.

## IV.   **THE *ORDER* IS ARBITRARY AND CAPRICIOUS.**

The *Order* is also arbitrary and capricious under the APA for several substantive and procedural reasons.

### A.   **The *Order* Abruptly Departs From Settled Agency Precedent.**

The *Order* sharply departs from the FCC's prior, longstanding position that Congress spoke directly to the precise question at hand, and that Section 614(b)(7) unambiguously *precludes* the use of equipment "offered" by cable operators to

ensure viewability. The agency announced this view nearly two decades ago, in its first order following enactment of Section 614(b)(7). There, the agency recognized that Section 614(b)(7) mandates that must carry signals be actually viewable. *Implementation of the Cable Television Consumer Protection and Competition Act of 1992*, 8 FCC Rcd 2965, 2974 (¶ 34) (1993) ("*1993 Report and Order*") (concluding that it lacks authority "to exempt any class of subscribers from this [viewability] requirement"). At the same time, it clarified the distinction between the second and third sentences of Section 614(b)(7), highlighting that a cable operator could meet its obligation under the statute by offering the "lease or sale[] of individual converter boxes" only for television sets not connected by the cable operator. *Id*. at n.99. On reconsideration, the FCC stayed its course, rejecting cable operators' arguments because "Congress made clear its intent that all subscribers have access to local commercial broadcast signals." *1994 Memorandum Opinion and Order*, 9 FCC Rcd at 6726 (¶ 15).[9]

---

[9] The agency's reliance on the *1994 Memorandum Opinion and Order* to argue that its new reading of Section 614(b)(7) is "consistent" with its "prior interpretations," *Order* ¶ 8 n.31 (JA__), is misplaced. What that ruling actually shows is that the Commission has previously and consistently read the statute to mean that a cable operator must make all signals viewable in the same manner and without additional cost to the subscriber. *See 1994 Memorandum Opinion and Order*, 9 FCC Rcd at 6726 (¶ 16) ("[w]here a cable operator chooses to provide subscribers with signals of must-carry stations through the use of converter boxes supplied by the cable operator," Section 614(b)(7) requires such converters to permit subscribers to access all must-carry signals, "not just some of them"). Indeed, the 1994 Order distinguished the cable operator's obligation for the initial connection(s) that it

The Commission reaffirmed this reading in its *2007 Order* adopting the viewability rule—a regulation that the agency itself found was compelled by the "plain meaning of the statutory text as well as the structure of the provision[.]" *2007 Order*, 22 FCC Rcd at 21073 (¶ 22) (JA__).  There, the FCC rejected arguments that an "'*offer* to sell or lease . . . a converter box'" to enable viewability satisfied the statute, reasoning that, for analog subscribers that do not have such a converter box, must-carry signals are not viewable.  *Id.* (JA__).[10]  And it expressly stated that there are "separate mandates set forth in the second and third sentences of Section 614(b)(7), a distinction we clarified as early as 1993."  *Id.* at 21073 (¶ 22) n.60 (JA__, __) (citing *1993 Report and Order*, 8 FCC Rcd at 2974 n.99).

More recently, in the *NPRM* that led to the *Order* on review, the FCC reiterated its view that it is "*bound by statute* to ensure that must-carry signals are *actually viewable* by all subscribers," *NPRM*, 27 FCC Rcd at 1715 (¶ 5) (JA__) (emphases added), and observed that proposals requiring the use of equipment to

provides from the operator's statutory obligation for additional subscriber connections, and also noted that "if it is necessary [for the cable operator] to replace [a basic converter with one capable of receiving all signals] the subscriber *must not be required to pay additional sums nor pay for the installation*."  *Id*. (¶ 16) n.43 (emphasis added).

[10] *See also id.* at 21073 (¶ 22) (JA__) ("To the extent that such subscribers do not have the necessary equipment . . . the broadcast signals in question are not 'viewable'[.]"); *id*. at 21079 (¶ 33) n.104 (JA__, __) ("[O]ver-the-air converter boxes and antennas . . . cannot fulfill the statutory mandate that must-carry signals be 'viewable via cable.'").

ensure viewability raise "the potential, if not a certainty, that must-carry signals would not be viewable by analog subscribers," *id*. at 1720 (¶ 14) & n.48 (JA__ & __).  The *NPRM* further reminded that "[t]he Commission has long held . . . that cable subscribers' use of an 'A/B switch' to access over-the-air signals is not a legitimate replacement for access to those signals on the cable system itself."  *Id*. at 1715 n.19 (JA__).  Yet, the *Order* embraces the very approach that the agency previously found unlawful.

It is rudimentary that an agency cannot, consistent with the APA, depart from its settled precedent absent reasoned explanation.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009); *see also Verizon Tel. Cos. v. FCC*, 570 F.3d 294, 300 (D.C. Cir. 2009).  The agency must not only "display awareness that it is changing position," but must show "that the new policy is permissible under the statute[.]"  *Fox*, 556 U.S. at 515.  Throughout the *Order*, the FCC time and again acknowledged that it had "reinterpreted" or adopted a "new" reading of the statute.  *See, e.g.*, *Order* ¶¶ 6, 8, 11, 15 (JA__, __, __, __).  But nothing in the language of Section 614 has changed, and nowhere does the *Order* explain how a statutory provision once found to be "straightforward" and "unambiguous" now permits precisely the opposite reading, *see id.* ¶ 11 (JA__).[11]

---

[11] The *Order* suggests that NAB opened the door to this reinterpretation of the statute when, in the spirit of compromise, NAB suggested that the "provi[sion of] *free* equipment that enables access to digital broadcast signals" might satisfy the

38

**B.      The Agency Arbitrarily Ignored Record Evidence Supporting Extension Of The Viewability Rule.**

The FCC also did not adequately explain why facts that it previously said would support a three-year extension instead supported repeal.  In the *2007 Order* and the *NPRM* alike, the Commission advised that it would review the viewability "rules in light of the potential cost and service disruption to consumers, and the state of technology and the marketplace."  *2007 Order*, 22 FCC Rcd at 21070 (¶ 16) (JA__); *accord NPRM*, 27 FCC Rcd at 1717 (¶ 9) (JA__).  Citing market evidence, the *NPRM* posited that "the viewability requirements remain important to consumers."  *Id*. (JA__).  It also stated that more than twelve million cable households rely on analog service entirely, and that, currently, the "vast majority of cable subscribers are served by 'hybrid' systems that provide both analog and digital service."  *Id*. (JA__).  Thus, the *NPRM* concluded that that "millions of subscribers, and the broadcasters who would be unable to reach them" would bear the brunt of repeal.  *Id*. at 1718 (¶ 10) (JA__).  Nothing in the record controverts

---

viewability requirement. *Ex Parte* Letter from NAB, CS Docket No. 98-120, at 2-3 (May 23, 2012) (JA__-__) (emphasis added).  Nothing in that letter supports the FCC's reinterpretation.  Fairly read, that letter suggested only that a cable operator might be able to meet its obligation if it provided an easily accessible, no-cost option for consumers to view must-carry signals.  NAB later withdrew this comment and, as the record shows, its position below was that the *2007 Order* correctly held that the "plain meaning" and "structure" of Section 614(b)(7) preclude an equipment-based solution.  *See* June 8 NAB *Ex Parte* at 3 (JA__) (collecting citations to record).  In any event, it is the agency's interpretation that is on review here.

these Commission findings, which were made a mere four months before issuance of the *Order*.

Instead, the record only serves to illustrate the substantial costs of near-term repeal for twelve million plus analog cable households and for must-carry broadcasters. *See, e.g.*, NAB Reply Comments at 6 (JA__) ("[O]f the 58.3 million total subscribers to basic cable video service, almost *12.6 million* households could be affected by repeal of the Viewability Rule.") (emphasis in original); April 23 NAB *Ex Parte* at 1 (JA__) ("[L]osses in viewing households and revenues associated with eliminating the current rule would have severe economic consequences for must carry stations.").

The record also reflects that analog subscribers stand to suffer "substantial service disruptions" as a result of repeal, and these subscribers "include some of the most vulnerable groups, including minorities, the aged, [] rural" and low-income viewers. June 1 Ion *Ex Parte* at 2-3 (JA__); *see also* April 26 NAB *Ex Parte*, Att. at 3 & n.8 (JA__ & __) (explaining that "the burden will fall on subscribers whose financial resources may be fueling decisions not to subscribe to digital cable" and noting that "[t]here is a significant disparity in the household incomes of those that select higher-end cable services and those that do not").

In addition, the record shows that "losses in viewing households and revenues associated with eliminating the current rule would have severe economic

40

consequences for must-carry stations." *Ex Parte* Letter from NAB, CS Docket No. 98-120, at 1 (May 4, 2012) ("May 4 NAB *Ex Parte*") (JA__); *accord* April 26 NAB *Ex Parte*, attach. at 5-9 (JA__) (providing evidence of same).  Must-carry stations tend to serve niche markets, offering religious and foreign language programming of particular interest to unserved and underserved audiences.  *See* April 27 UVM *Ex Parte* at 1-2 (JA__); June 4 Entravision *Ex Parte* at 1 (JA__); May 4 Daystar *Ex Parte* at 1 (JA__); Mapale May 1 *Ex Parte* at 2 (JA__).  Thus, repeal will most heavily burden vulnerable communities and the stations that serve them.

The record further indicates that an equipment-based alternative will not ameliorate these substantial costs and service disruptions.  An "offer" of equipment will not ensure viewability for these analog subscribers.  NAB and others commented that "an equipment-based approach raises multiple barriers for consumers, including the cost of boxes, education around the need for boxes, ordering boxes, and installation/setup." June 5 NAB *Ex Parte* at 1 (JA__); *see also* June 1 Ion *Ex Parte* at 4 (JA__) ("[F]ew subscribers can be expected to go through the trouble and expense of acquiring and installing [equipment] just to obtain access to must-carry stations.").  Others commented that the "vast majority of affected viewers will be unaware of the change and will abruptly lose access to programming they now enjoy."  June 5 Northwest Broadcasting *Ex Parte* at 2

41

(JA__); *see also* June 9 NBRB *Ex Parte* at 2 (JA__) ("Many will not understand the need for additional equipment[.]").  As a result, must-carry broadcasters stand to suffer "losses in viewing households and revenues" with potentially "severe economic consequences" under the equipment-based approach.  June 7 NAB *Ex Parte* at 3 (JA__); *see also* June 9 NBRB *Ex Parte* at 3 (JA__) (an equipment-based solution would "erode viewership").

Because the agency failed to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" and because its decision "runs counter to the evidence before it," the *Order* is arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted); *accord United States Telecom Ass'n v. FCC*, 227 F.3d 450, 461-62 (D.C. Cir. 2000).

## C.    The Commission's Conclusion That "Affordable" DTAs Are Readily Available Is Contrary To Record Evidence.

The agency's conclusion that low-cost DTAs are readily available in an "affordable" range of "no more than $2[,]" *see Order* ¶ 14 (JA__), is unsupported by, and contrary to, record evidence.  *See State Farm*, 463 U.S. at 43; *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604-05 (D.C. Cir. 2007).  *First*, the record does not contain sufficient evidence that DTAs would be offered in the range of "no more than $2" that the FCC found "affordable," s*ee Order* ¶ 14 (JA__).

42

Instead, the record shows that  boxes "range [in price] from $1 to $6.99 per month." *Ex Parte* Letter from National Cable & Telecommunications Association, CS Docket No. 98-120, at 2 n.6 (Apr. 26, 2012) ("April 26 NCTA *Ex Parte*") (JA__).  It also reflects uncertainty on the part of small cable operators that they can offer equipment at the same "affordable" rates as their larger competitors. *See Ex Parte* Letter from American Cable Association, CS Docket No. 98-120, at 3 (June 11, 2012) ("June 11 ACA *Ex Parte*") (JA__) (arguing for "an affordability standard that takes account of the fact that small cable operators incur higher per-unit fees to acquire boxes than larger providers, and also incur recurring monthly per-unit fees when subscribers utilize additional set-top boxes").

*Second*, the record lacks evidence supporting the FCC's apparent conclusion that a charge of $2 per month is uniformly "affordable" for analog subscribers—particularly considering that this continuing monthly fee is in addition to the substantial costs of subscribing to cable television service.   Indeed, this determination cannot be squared with the concern, reflected in the record below, that analog "viewers are often lower income families who cannot afford to upgrade or rent new equipment" to receive must-carry signals. *Ex Parte* Letter from NAB, CS Docket No. 98-120, at 1 (May 22, 2012) ("May 22 NAB *Ex Parte*") (JA__).

*Third*, the record contains only bare assertions that DTAs are readily available, and not real evidence of availability sufficient to meet increased demand

on the order of well over twelve million units (and perhaps millions more for secondary receivers in all cable households) post-repeal. Evidence suggests that "the precise number and availability of [DTAs] is difficult to quantify," April 26 NCTA *Ex Parte* at 2 n.5 (JA__), and that small cable operators cannot obtain and, by extension, cannot offer, DTAs at the same low costs as larger operators, June 11 ACA *Ex Parte* at 2 (JA__). Moreover, the record shows that certain cable "systems do not currently have a low-cost DTA option available[.]" *Ex Parte* Letter from Bright House Networks, LLC, CS Dkt. No. 98-120, at 2 (Apr. 17, 2012) (JA__). Greater evidence of availability was required, particularly because "the availability of affordable set-top boxes" was "*[c]ritical* to [the FCC's] decision to allow the viewability rule to sunset," *Order* ¶ 17 (JA__) (emphasis added).

### D.     The *Order* Irrationally Failed To Consider The One-Third Spectrum Capacity Cap.

The agency also acted arbitrarily "[b]y ducking serious evaluation of the costs" to cable operators of the viewability rule, *Business Roundtable v. SEC*, 647 F.3d 1144, 1152 (D.C. Cir. 2011), and by failing to consider relevant factors brought to its attention, *e.g.*, *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005).

Weighing the effect of repeal, the FCC concluded that "eliminating the [viewability] rule will result in significant benefits to cable operators in meeting

44

the increasing demands of" their digital subscribers.  *Order* ¶ 16 (JA__).  To reach

this conclusion, the FCC relied on cable industry assertions that operators "'face

capacity demands from an increasing proliferation of HD programming services as

well as from broadband video services,'" *id.* (quoting Reply Comments of NCTA,

CS Docket No. 98-120, at 5 (Mar. 22, 2012)) (JA__), and that the viewability rule

inhibits cable operators' efficient use of capacity, *id*. ¶ 86 & n.86 (JA__).

But Congress considered the burdens of a mandatory carriage regime to

cable operators when it enacted the Cable Act and imposed a statutory limit of one-

third on the amount of channel capacity a cable operator must devote to must-carry

signals.  47 U.S.C. § 534(b)(1)(B).  Comments below suggest that the viewability

rule burdens cable operators, if at all, only minimally in light of this cap.  *See* June

1 Ion *Ex Parte* at 3  (JA__); April 27 Ion *Ex Parte* at 3  (JA__).   Indeed,

broadcasters argued that "the viewability rule has not caused any cable system to

come anywhere near this cap," *see* June 1 Ion *Ex Parte* at 3, and no cable operator

refuted this contention.[12]

---

[12] Specifically, the record contains no evidence whatsoever that the viewability rule actually constrained the spectrum capacity of any cable operator in a significant way.  "When the FCC did require cable operators to present actual data concerning cable capacity, [the data] showed that – as of 2003 – carriage of both analog and digital signals of all local television stations would occupy less than 8.5 percent of an average cable system."  NAB Reply Comments at 9 (JA__).   And cable operatores submitted no data at all on the percent of capacity that hybrid systems use for analog service as compared to total bandwidth.  Bare assertions of

45

In the *2007 Order* and *NPRM*, the agency confirmed the importance of this statutory limit to its cost-benefit analysis.  It acknowledged that the one-third carriage cap "remains in effect in the digital carriage context, and that all versions of a signal would count toward this cap.  As a result, no cable system need ever dedicate more than one-third of their bandwidth to carriage of commercial broadcast stations."  *NPRM*, 27 FCC Rcd at 1719 (¶ 12) (citing *2007 Order*, 22 FCC Rcd at 21081 (¶ 36)) (JA__).  But the *Order* on review entirely ignores this factor.

Instead, the *Order* credits cable operators' arguments that they should be excused from compliance with the viewability mandate in order to devote bandwidth to the transmission of other, non-must-carry programming.  *See Order* ¶ 16 (JA__).  Such comments do not justify the finding that repeal of the viewability rule was warranted here.  As the *NPRM* explained, the viewability rule is voluntary in the sense that operators "can comply fully with their viewability obligations by simply carrying a must-carry signal in digital."  *NPRM*, 27 FCC Rcd at 1719 (¶ 13) (JA__).  The *Order* does not explain how this factor tips the balance toward repeal where cable operators could free bandwidth for supplemental programming sources *and* transmit digital must-carry signals without additional equipment, by converting their own operations to all-digital.

---

"capacity constraints" do not suffice, especially given the dramatic increases in cable system capacity over the past decade.  *See id*. (JA__).

46

Nor does the *Order* ever even mention the existence of the one-third channel capacity cap in evaluating the burdens and benefits of eliminating the viewability rule.  This "'failure to respond meaningfully' to objections raised by a party renders [the FCC's] decision arbitrary and capricious," because "'[u]nless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned.'"  *PPL Wallingford*, 419 F.3d at 1198 (citations omitted, alteration in original).

### E.    The Commission Irrationally Concluded That A Six Month Transition Period Is Adequate.

In the *Order*, the FCC determined that the viewability rule should cease to be effective a mere six months from adoption of the *Order*.  *Order* ¶ 17 (JA__). The agency posited that a six-month period would be sufficient to "provide cable operators an opportunity to acquire an adequate supply of equipment" and to notify broadcasters and customers of plans to change carriage.  *Id.* (JA__).  It also stated that the six-month period will "allow consumers sufficient time to make any necessary arrangements" and stressed that "effective consumer outreach . . . will greatly minimize the impact" of repeal on viewers and must-carry broadcasters. *Id.* (JA__).  Yet, the agency's conclusion that six months will allow a "smooth transition" is arbitrary and capricious.

As an initial matter, the agency's decision to adopt a six-month transition period is wholly irrational in light of the experience with the DTV transition.  In

1997, Congress and the FCC initially set December 31, 2006 as the target deadline for the completion of the transition to DTV. *DTV Fifth Report and Order*, 12 FCC Rcd at 12850 (¶ 99); 47 U.S.C. § 309(j)(14)(B) (2004). Congress later set a "hard date" of February 17, 2009 for the end of the transition, and allowed a full three-year period following adoption of the deadline and the effective date for the DTV transition. *See* Digital Television and Public Safety Act of 2005, Pub. L. No. 109-171, 120 Stat. 4 (Feb. 8, 2006).

After Congress established the February 2009 deadline, the agency conducted a rulemaking specially focused on "the best means of creating a coordinated, national DTV consumer education campaign" in recognition of "a clear and compelling need for educational efforts directed toward consumers." *DTV Consumer Education Initiative*, Report and Order, 23 FCC Rcd 4134, 4137-38 (¶¶ 4, 6) (2008) ("*DTV Consumer Education Order*"). As one element of its multi-layered educational campaign, the agency required cable operators to provide prominent monthly DTV notices in customer billing statements, with specific content. *Id*. at 4152 (¶ 38).[13]

Full education efforts went into effect nearly a year before the February 17, 2009 transition date. *See* Public Notice, *Media Bureau Announces Effective Date*

_____

[13] Notably, the Commission did so notwithstanding a voluntary commitment of NCTA to include DTV notices in subscriber bills, noting that "the commitments of NCTA do not bind its member cable operators[.]" *Id*. at 4153-54 (¶¶ 39-40).

48

*for Revised Rules in the DTV Consumer Education Initiative*, 23 FCC Rcd 8410 (2008) (announcing March 30, 2008 effective date). Nevertheless, based in part on concerns that consumers were inadequately informed regarding the impending transition, Congress postponed the deadline again, this time for an additional four months, to ensure that viewers would not lose access to their broadcast television signals. *See* DTV Delay Act, Pub. L. No. 111-4, 123 Stat. 112 (2009); *Ex Parte* Letter from Independent Voices for Local TV, CS Docket No. 98-120, at 1 (June 7, 2012) (JA__) ("while broadcasters had largely concluded their upgrade to DTV by the end of 2006 . . . it was concern for consumer welfare that justified subsequent delays and consumer support programs").

Suffice it to say that the DTV transition involved a massive effort by government and industry to educate consumers regarding necessary equipment, and the Commission "spent years designing and implementing a government subsidized digital-to-analog converter program" for the DTV transition. June 1 Ion *Ex Parte* at 6 (JA__); *see also* June 4 Entravision *Ex Parte* at 2 (JA__). Notwithstanding the long lead-time and extensive educational campaign that preceded the DTV transition, many consumers *still* were not prepared. For example, in the days surrounding the transition, the FCC received over 900,000 calls from consumers seeking assistance with converter box set-up, reporting difficulty receiving certain stations, or requesting help with broader reception

49

issues.  Press Release, FCC, FCC Continues DTV Outreach Across the Nation:
Call Center Receives Over 900,000 Calls in Days Surrounding Transition (June 15,
2009).     In light of this history, the record below unsurprisingly reflected that a
six-month transition period would be a "woefully insufficient amount of time for
consumers to prepare themselves for the loss of must-carry stations that they
currently enjoy."  June 7 NRJ TV *Ex Parte* at 1 (JA__); *accord* June 5 Northwest
Broadcasting *Ex Parte* at 2 (JA__) ("Six months is simply not enough time.").

   Although broadcasters urged the Commission to take account of its past
experience with the DTV transition here, *see supra* at 11, the *Order* provides for
elimination of the viewability rule only six months after the *Order* was adopted,
*Order* ¶ 17 (JA__).  It fails to adopt *any* measures to ensure consumer awareness of
this new transition.  Instead, it leaves cable operators free to provide "notice" in the
least obtrusive manner, a mere 30 days before carriage changes.  *See id.* (JA__).
Such notice is especially inadequate as consumer awareness of the need to take
action in this context is likely to be low, given that the cable industry previously
told their subscribers that they need do nothing to prepare for the DTV transition.
And, although it acknowledges the importance of "effective consumer outreach,"
*id.* (JA__), the *Order* neither contemplates nor requires *any* specific educational
effort at all.

   To make matters worse, the six-month period is, upon examination, wholly

illusory.   The decision whether to require the use of a DTA to access any individual must-carry signal is a matter left wholly within a cable operator's discretion, so that any particular broadcaster has no way of knowing if it will be subject to this fate.  *See supra* at 13.   Moreover, the *Order* relies on a *voluntary* commitment by a limited number of cable operators to notify broadcasters a mere 90 days before a change.  *See Order* ¶ 17 (JA__).   At best, then, some broadcasters may have 90 days—*not* six months—notice of the need for viewer education. Their viewers, by contrast, are entitled under the *Order* to only 30 days notice.  *Id.* n. 89 (JA__).   The Commission's conclusion that six months will allow a "smooth transition" for viewers or for must-carry broadcasters following repeal is arbitrary and capricious and should be reversed.

## V.    THE FCC FAILED TO PROVIDE ADEQUATE NOTICE THAT IT WAS CONTEMPLATING EQUIPMENT-BASED ALTERNATIVES.

The *Order* further violates the APA because the Commission failed to provide interested parties with adequate notice that it was considering an equipment-based alternative.  5 U.S.C. § 553(b)(3); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009).  The *NPRM* reminded parties that the FCC previously had rejected equipment-based alternatives as insufficient given "the potential, if not . . . certainty, that must-carry signals would not be viewable by analog subscribers."  *NPRM*, 27 FCC Rcd at 1720 (¶ 14) & n.48 (JA__ & __). And it expressly proposed *to extend* the viewability rule until June 12, 2015.  *Id*. at

1727 (App. A) (JA__) (proposed rule). The FCC never announced that it was considering an equipment-based proposal; instead, interested parties learned as much only through press accounts.

But it is black-letter law that the FCC "must itself provide notice of a regulatory proposal. Having failed to do so, it cannot bootstrap notice from a comment," *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983), or from third-party accounts of what the agency might be considering. *See also Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991) (explaining that because it is "the business of the" agency, "not the public, to foresee" and address potential issues, "comments by members of the public [do] not in themselves constitute adequate notice"). The Commission thus deprived interested parties, such as cable customers and local broadcast stations, of an opportunity to meaningfully review and comment upon the alternative it ultimately adopted, in violation of the APA. *See Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132-33 (D.C. Cir. 1995) ("Notice of a proposed rule must include sufficient detail on its content and basis in law and evidence to allow for meaningful and informed comment[.]").

## CONCLUSION

For the foregoing reasons, Joint Petitioners respectfully request that the Court grant their Petition for Review, and reverse and remand the *Order*.

52

Respectfully submitted,

/s/ Helgi C. Walker

Jim Grant
AGAPE CHURCH, INC.
701 Napa Valley Drive
Little Rock, Arkansas 72211
Tel:  501.225.0612

Helgi C. Walker*
Kathleen A. Kirby
Eve Klindera Reed
Christiane M. McKnight
WILEY REIN LLP
1776 K Street NW
Washington DC 20006
Tel:  202.719.7000
Fax:  202.719.7049

Philip Hurley
LONDON BROADCASTING CO.
5052 Addison Circle
Addison, Texas 75001
Tel:  214.812.9600

*Counsel of Record for Joint Petitioners

Jane E. Mago
Jerianne Timmerman
Erin Dozier
NATIONAL ASSOCIATION
    OF BROADCASTERS
1771 N Street NW
Washington DC 20036
Tel:  202.429.5430

Terence Crosby
UNA VEZ MAS, LP
703 McKinney Avenue
Suite 240
Dallas, Texas 75202
Tel:  214.754.7008

November 9, 2012

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 12,634 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a)(2).

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in proportionally spaced typeface using the 2010 version of Microsoft Word in 14 point Times New Roman.

*/s/ Helgi C. Walker*
Helgi C. Walker

ADDENDUM

# STATUTORY AND REGULATIONS

## TABLE OF CONTENTS

5 U.S.C. § 553 ...................................................................................A2

5 U.S.C. § 706 ...................................................................................A2

47 U.S.C. § 309 (2004) ......................................................................A3

47 U.S.C. § 309 (2006) ......................................................................A4

47 U.S.C. § 309 (2009) ......................................................................A5

47 U.S.C. § 325 ...................................................................................A5

47 U.S.C. § 338 ...................................................................................A9

47 U.S.C. § 521 note. ........................................................................A9

47 U.S.C. § 534 .................................................................................A14

47 U.S.C. § 535 .................................................................................A16

47 C.F.R. § 76.56 (2008) .................................................................A16

47 C.F.R. § 76.56 (2012) .................................................................A17

A1

ADDENDUM

## 5 U.S.C. § 553(b)(3)

\* \* \*

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

    (1) a statement of the time, place, and nature of public rule making proceedings;

    (2) reference to the legal authority under which the rule is proposed; and

    (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

    (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

    (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

\* \* \*

## 5 U.S.C. § 706

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

    (1) compel agency action unlawfully withheld or unreasonably delayed; and

    (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

A2

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 47 U.S.C. § 309(j)(14)(A)-(B) (2004)

(14) Auction of recaptured broadcast television spectrum

(A) Limitations on terms of terrestrial television broadcast licenses

A television broadcast license that authorizes analog television service may not be renewed to authorize such service for a period that extends beyond December 31, 2006.

(B) Extension

The Commission shall extend the date described in subparagraph (A) for any station that requests such extension in any television market if the Commission finds that—

(i) one or more of the stations in such market that are licensed to or affiliated with one of the four largest national television networks are not

A3

broadcasting a digital television service signal, and the Commission finds that each such station has exercised due diligence and satisfies the conditions for an extension of the Commission's applicable construction deadlines for digital television service in that market;

(ii) digital-to-analog converter technology is not generally available in such market; or

(iii) in any market in which an extension is not available under clause (i) or (ii), 15 percent or more of the television households in such market—

(I) do not subscribe to a multichannel video programming distributor (as defined in section 522 of this title) that carries one of the digital television service programming channels of each of the television stations broadcasting such a channel in such market; and

(II) do not have either—

(a) at least one television receiver capable of receiving the digital television service signals of the television stations licensed in such market; or

(b) at least one television receiver of analog television service signals equipped with digital-to-analog converter technology capable of receiving the digital television service signals of the television stations licensed in such market.

\* \* \*

## 47 U.S.C. § 309(j)(14)(A) (2006), as amended by the Digital Television and Public Safety Act of 2005, Pub. L. No. 109-171, 120 Stat. 4 (2006)

(14) Auction of recaptured broadcast television spectrum

(A) Limitations on terms of terrestrial television broadcast licenses

A television broadcast license that authorizes analog television service may not be renewed to authorize such service for a period that extends beyond February 17, 2009.

\* \* \*

A4

ADDENDUM

**47 U.S.C. § 309(j)(14)(A) (2009), as amended by the DTV Delay Act, Pub. L. No. 111-4, 123 Stat. 112 (2009)**

(14) Auction of recaptured broadcast television spectrum

(A) Limitations on terms of terrestrial television broadcast licenses

A television broadcast license that authorizes analog television service may not be renewed to authorize such service for a period that extends beyond June 12, 2009.

\* \* \*

**47 U.S.C. § 325(b)(1)(A)**

\* \* \*

(b) Consent to retransmission of broadcasting station signals

(1)  No cable system or other multichannel video programming distributor shall retransmit the signal of a broadcasting station, or any part thereof, except

(A) with the express authority of the originating station;

(B) under section 534 of this title, in the case of a station electing, in accordance with this subsection, to assert the right to carriage under such section; or

(C) under section 338 of this title, in the case of a station electing, in accordance with this subsection, to assert the right to carriage under such section.

(2) This subsection shall not apply—

(A) to retransmission of the signal of a noncommercial television broadcast station;

A5

ADDENDUM

(B) to retransmission of the signal of a television broadcast station outside the station's local market by a satellite carrier directly to its subscribers, if—

(i) such station was a superstation on May 1, 1991;

(ii) as of July 1, 1998, such station was retransmitted by a satellite carrier under the statutory license of section 119 of Title 17; and

(iii) the satellite carrier complies with any network nonduplication, syndicated exclusivity, and sports blackout rules adopted by the Commission under section 339(b) of this title;

(C) until December 31, 2014, to retransmission of the signals of network stations directly to a home satellite antenna, if the subscriber receiving the signal—

(i) is located in an area outside the local market of such stations; and

(ii) resides in an unserved household;

(D) to retransmission by a cable operator or other multichannel video provider, other than a satellite carrier, of the signal of a television broadcast station outside the station's local market if such signal was obtained from a satellite carrier and—

(i) the originating station was a superstation on May 1, 1991; and

(ii) as of July 1, 1998, such station was retransmitted by a satellite carrier under the statutory license of section 119 of Title 17; or

(E) during the 6-month period beginning on November 29, 1999, to the retransmission of the signal of a television broadcast station within the station's local market by a satellite carrier directly to its subscribers under the statutory license of section 122 of Title 17.

For purposes of this paragraph, the terms "satellite carrier" and "superstation" have the meanings given those terms, respectively, in section 119(d) of Title 17, as in effect on October 5, 1992, the term "unserved household" has the meaning given that term under section 119(d) of such title, and the term "local market" has the meaning given that term in section 122(j) of such title.

A6

ADDENDUM

(3)(A) Within 45 days after October 5, 1992, the Commission shall commence a rulemaking proceeding to establish regulations to govern the exercise by television broadcast stations of the right to grant retransmission consent under this subsection and of the right to signal carriage under section 534 of this title, and such other regulations as are necessary to administer the limitations contained in paragraph (2). The Commission shall consider in such proceeding the impact that the grant of retransmission consent by television stations may have on the rates for the basic service tier and shall ensure that the regulations prescribed under this subsection do not conflict with the Commission's obligation under section 543(b)(1) of this title to ensure that the rates for the basic service tier are reasonable. Such rulemaking proceeding shall be completed within 180 days after October 5, 1992.

(B) The regulations required by subparagraph (A) shall require that television stations, within one year after October 5, 1992, and every three years thereafter, make an election between the right to grant retransmission consent under this subsection and the right to signal carriage under section 534 of this title. If there is more than one cable system which services the same geographic area, a station's election shall apply to all such cable systems.

(C) The Commission shall commence a rulemaking proceeding to revise the regulations governing the exercise by television broadcast stations of the right to grant retransmission consent under this subsection, and such other regulations as are necessary to administer the limitations contained in paragraph (2). Such regulations shall—

(i) establish election time periods that correspond with those regulations adopted under subparagraph (B) of this paragraph;

(ii) until January 1, 2015, prohibit a television broadcast station that provides retransmission consent from engaging in exclusive contracts for carriage or failing to negotiate in good faith, and it shall not be a failure to negotiate in good faith if the television broadcast station enters into retransmission consent agreements containing different terms and conditions, including price terms, with different multichannel video programming distributors if such different terms and conditions are based on competitive marketplace considerations; and

A7

(iii) until January 1, 2015, prohibit a multichannel video programming distributor from failing to negotiate in good faith for retransmission consent under this section, and it shall not be a failure to negotiate in good faith if the distributor enters into retransmission consent agreements containing different terms and conditions, including price terms, with different broadcast stations if such different terms and conditions are based on competitive marketplace considerations.

(4) If an originating television station elects under paragraph (3)(B) to exercise its right to grant retransmission consent under this subsection with respect to a cable system, the provisions of section 534 of this title shall not apply to the carriage of the signal of such station by such cable system. If an originating television station elects under paragraph (3)(C) to exercise its right to grant retransmission consent under this subsection with respect to a satellite carrier, section 338 of this title shall not apply to the carriage of the signal of such station by such satellite carrier.

(5) The exercise by a television broadcast station of the right to grant retransmission consent under this subsection shall not interfere with or supersede the rights under section 338, 534, or 535 of this title of any station electing to assert the right to signal carriage under that section.

(6) Nothing in this section shall be construed as modifying the compulsory copyright license established in section 111 of Title 17 or as affecting existing or future video programming licensing agreements between broadcasting stations and video programmers.

(7) For purposes of this subsection, the term—

(A) "network station" has the meaning given such term under section 119(d) of Title 17; and

(B) "television broadcast station" means an over-the-air commercial or noncommercial television broadcast station licensed by the Commission under subpart E of part 73 of title 47, Code of Federal Regulations, except that such term does not include a low-power or translator television station.

* * *

A8

ADDENDUM

## 47 U.S.C. §§ 338(d), (j)

\* \* \*

(d) Channel positioning

No satellite carrier shall be required to provide the signal of a local television broadcast station to subscribers in that station's local market on any particular channel number or to provide the signals in any particular order, except that the satellite carrier shall retransmit the signal of the local television broadcast stations to subscribers in the stations' local market on contiguous channels and provide access to such station's signals at a nondiscriminatory price and in a nondiscriminatory manner on any navigational device, on-screen program guide, or menu.

\* \* \*

(j) Regulations by Commission

Within 1 year after November 29, 1999, the Commission shall issue regulations implementing this section following a rulemaking proceeding. The regulations prescribed under this section shall include requirements on satellite carriers that are comparable to the requirements on cable operators under sections 534(b)(3) and (4) and 535(g)(1) and (2) of this title.

\* \* \*

## 47 U.S.C. § 521 nt.

\* \* \*

Congressional Findings and Policy: Cable Television Consumer Protection and Competition Act of 1992

Pub. L. 102-385, §§ 2(a), (b), 28, Oct. 5, 1992, 106 Stat. 1460, eff. 60 days after Oct. 5, 1992, provided that:

(a) Findings.—The Congress finds and declares the following:

A9

ADDENDUM

(1) Pursuant to the Cable Communications Policy Act of 1984 [this subchapter], rates for cable television services have been deregulated in approximately 97 percent of all franchises since December 29, 1986. Since rate deregulation, monthly rates for the lowest priced basic cable service have increased by 40 percent or more for 28 percent of cable television subscribers. Although the average number of basic channels has increased from about 24 to 30, average monthly rates have increased by 29 percent during the same period. The average monthly cable rate has increased almost 3 times as much as the Consumer Price Index since rate deregulation.

(2) For a variety of reasons, including local franchising requirements and the extraordinary expense of constructing more than one cable television system to serve a particular geographic area, most cable television subscribers have no opportunity to select between competing cable systems. Without the presence of another multichannel video programming distributor, a cable system faces no local competition. The result is undue market power for the cable operator as compared to that of consumers and video programmers.

(3) There has been a substantial increase in the penetration of cable television systems over the past decade. Nearly 56,000,000 households, over 60 percent of the households with televisions, subscribe to cable television, and this percentage is almost certain to increase. As a result of this growth, the cable television industry has become a dominant nationwide video medium.

(4) The cable industry has become highly concentrated. The potential effects of such concentration are barriers to entry for new programmers and a reduction in the number of media voices available to consumers.

(5) The cable industry has become vertically integrated; cable operators and cable programmers often have common ownership. As a result, cable operators have the incentive and ability to favor their affiliated programmers. This could make it more difficult for noncable-affiliated programmers to secure carriage on cable systems. Vertically integrated program suppliers also have the incentive and ability to favor their affiliated cable operators over nonaffiliated cable operators and programming distributors using other technologies.

(6) There is a substantial governmental and First Amendment interest in promoting a diversity of views provided through multiple technology media.

A10

ADDENDUM

(7) There is a substantial governmental and First Amendment interest in ensuring that cable subscribers have access to local noncommercial educational stations which Congress has authorized, as expressed in section 396(a)(5) of the Communications Act of 1934 [section 396(a)(5) of this title]. The distribution of unique noncommercial, educational programming services advances that interest.

(8) The Federal Government has a substantial interest in making all nonduplicative local public television services available on cable systems because—

    (A) public television provides educational and informational programming to the Nation's citizens, thereby advancing the Government's compelling interest in educating its citizens;

    (B) public television is a local community institution, supported through local tax dollars and voluntary citizen contributions in excess of $10,800,000,000 since 1972, that provides public service programming that is responsive to the needs and interests of the local community;

    (C) the Federal Government, in recognition of public television's integral role in serving the educational and informational needs of local communities, has invested more than $3,000,000,000 in public broadcasting since 1969; and

    (D) absent carriage requirements there is a substantial likelihood that citizens, who have supported local public television services, will be deprived of those services.

(9) The Federal Government has a substantial interest in having cable systems carry the signals of local commercial television stations because the carriage of such signals is necessary to serve the goals contained in section 307(b) of the Communications Act of 1934 [section 307(b) of this title] of providing a fair, efficient, and equitable distribution of broadcast services.

(10) A primary objective and benefit of our Nation's system of regulation of television broadcasting is the local origination of programming. There is a substantial governmental interest in ensuring its continuation.

(11) Broadcast television stations continue to be an important source of local news and public affairs programming and other local broadcast services critical to an informed electorate.

(12) Broadcast television programming is supported by revenues generated from advertising broadcast over stations. Such programming is otherwise free to those who own television sets and do not require cable transmission to receive broadcast signals. There is a substantial governmental interest in promoting the continued availability of such free television programming, especially for viewers who are unable to afford other means of receiving programming.

(13) As a result of the growth of cable television, there has been a marked shift in market share from broadcast television to cable television services.

(14) Cable television systems and broadcast television stations increasingly compete for television advertising revenues. As the proportion of households subscribing to cable television increases, proportionately more advertising revenues will be reallocated from broadcast to cable television systems.

(15) A cable television system which carries the signal of a local television broadcaster is assisting the broadcaster to increase its viewership, and thereby attract additional advertising revenues that otherwise might be earned by the cable system operator. As a result, there is an economic incentive for cable systems to terminate the retransmission of the broadcast signal, refuse to carry new signals, or reposition a broadcast signal to a disadvantageous channel position. There is a substantial likelihood that absent the reimposition of such a requirement, additional local broadcast signals will be deleted, repositioned, or not carried.

(16) As a result of the economic incentive that cable systems have to delete, reposition, or not carry local broadcast signals, coupled with the absence of a requirement that such systems carry local broadcast signals, the economic viability of free local broadcast television and its ability to originate quality local programming will be seriously jeopardized.

(17) Consumers who subscribe to cable television often do so to obtain local broadcast signals which they otherwise would not be able to receive, or to obtain improved signals. Most subscribers to cable television systems do not or cannot maintain antennas to receive broadcast television services, do not have input selector switches to convert from a cable to antenna reception system, or

A12

ADDENDUM

cannot otherwise receive broadcast television services. The regulatory system created by the Cable Communications Policy Act of 1984 [this subchapter] was premised upon the continued existence of mandatory carriage obligations for cable systems, ensuring that local stations would be protected from anticompetitive conduct by cable systems.

(18) Cable television systems often are the single most efficient distribution system for television programming. A Government mandate for a substantial societal investment in alternative distribution systems for cable subscribers, such as the 'A/B' input selector antenna system, is not an enduring or feasible method of distribution and is not in the public interest.

(19) At the same time, broadcast programming that is carried remains the most popular programming on cable systems, and a substantial portion of the benefits for which consumers pay cable systems is derived from carriage of the signals of network affiliates, independent television stations, and public television stations. Also cable programming placed on channels adjacent to popular off-the-air signals obtains a larger audience than on other channel positions. Cable systems, therefore, obtain great benefits from local broadcast signals which, until now, they have been able to obtain without the consent of the broadcaster or any copyright liability. This has resulted in an effective subsidy of the development of cable systems by local broadcasters. While at one time, when cable systems did not attempt to compete with local broadcasters for programming, audience, and advertising, this subsidy may have been appropriate, it is so no longer and results in a competitive imbalance between the 2 industries.

(20) The Cable Communications Policy Act of 1984 [this subchapter], in its amendments to the Communications Act of 1934 [this chapter], limited the regulatory authority of franchising authorities over cable operators. Franchising authorities are finding it difficult under the current regulatory scheme to deny renewals to cable systems that are not adequately serving cable subscribers.

(21) Cable systems should be encouraged to carry low-power television stations licensed to the communities served by those systems where the low-power station creates and broadcasts, as a substantial part of its programming day, local programming.

(b) Statement of policy.—It is the policy of the Congress in this Act [Pub. L. 102-385, Oct. 5, 1992, 106 Stat. 1460, for classifications to which see Short Title of 1992 Amendments note under section 609 of this title] to—

(1) promote the availability to the public of a diversity of views and information through cable television and other video distribution media;

(2) rely on the marketplace, to the maximum extent feasible, to achieve that availability;

(3) ensure that cable operators continue to expand, where economically justified, their capacity and the programs offered over their cable systems;

(4) where cable television systems are not subject to effective competition, ensure that consumer interests are protected in receipt of cable service; and

(5) ensure that cable television operators do not have undue market power vis-à-vis video programmers and consumers.

## 47 U.S.C. 534

(a) Carriage obligations

Each cable operator shall carry, on the cable system of that operator, the signals of local commercial television stations and qualified low power stations as provided by this section. Carriage of additional broadcast television signals on such system shall be at the discretion of such operator, subject to section 325(b) of this title.

(b) Signals required

(1) In general

(A) A cable operator of a cable system with 12 or fewer usable activated channels shall carry the signals of at least three local commercial television stations, except that if such a system has 300 or fewer subscribers, it shall not be subject to any requirements under this section so long as such system does not delete from carriage by that system any signal of a broadcast television station.

(B) A cable operator of a cable system with more than 12 usable activated channels shall carry the signals of local commercial television stations, up to one-third of the aggregate number of usable activated channels of such system.

* * *

(4) Signal quality

(A) Nondegradation; technical specifications

The signals of local commercial television stations that a cable operator carries shall be carried without material degradation. The Commission shall adopt carriage standards to ensure that, to the extent technically feasible, the quality of signal processing and carriage provided by a cable system for the carriage of local commercial television stations will be no less than that provided by the system for carriage of any other type of signal.

(B) Advanced television

At such time as the Commission prescribes modifications of the standards for television broadcast signals, the Commission shall initiate a proceeding to establish any changes in the signal carriage requirements of cable television systems necessary to ensure cable carriage of such broadcast signals of local commercial television stations which have been changed to conform with such modified standards.

* * *

(7) Signal availability

Signals carried in fulfillment of the requirements of this section shall be provided to every subscriber of a cable system. Such signals shall be viewable via cable on all television receivers of a subscriber which are connected to a cable system by a cable operator or for which a cable operator provides a connection. If a cable operator authorizes subscribers to install additional receiver connections, but does not provide the subscriber with such connections, or with the equipment and materials for such connections, the operator shall notify such subscribers of all broadcast stations carried on the cable system which cannot be viewed via cable without a converter box and

A15

shall offer to sell or lease such a converter box to such subscribers at rates in accordance with section 543(b)(3) of this title.

\* \* \*

## 47 U.S.C. § 535

(a) Carriage obligations

In addition to the carriage requirements set forth in section 534 of this title, each cable operator of a cable system shall carry the signals of qualified noncommercial educational television stations in accordance with the provisions of this section.

\* \* \*

(h) Availability of signals

Signals carried in fulfillment of the carriage obligations of a cable operator under this section shall be available to every subscriber as part of the cable system's lowest priced service tier that includes the retransmission of local commercial television broadcast signals.

\* \* \*

## 47 C.F.R. § 76.56 (2008) ("Viewability Rule")

\* \* \*

(d) Availability of signals.

(1) Local commercial television stations carried in fulfillment of the requirements of this section shall be provided to every subscriber of a cable system. Such signals shall be viewable via cable on all television receivers of a subscriber which are connected to a cable system by a cable operator or for which a cable operator provides a connection.

(2) Qualified local NCE television stations carried in fulfillment of the carriage obligations of a cable operator under this section shall be available to every subscriber as part of the cable system's lowest priced service tier that includes the retransmission of local commercial television broadcast signals.

A16

ADDENDUM

(3) The viewability and availability requirements of this section require that, after the broadcast television transition from analog to digital service for full power television stations cable operators must either:

(i) Carry the signals of commercial and non-commercial must-carry stations in analog format to all analog cable subscribers, or

(ii) For all-digital systems, carry those signals in digital format, provided that all subscribers, including those with analog television sets, that are connected to a cable system by a cable operator or for which the cable operator provides a connection have the necessary equipment to view the broadcast content.

(4) Any costs incurred by a cable operator in downconverting or carrying alternative-format versions of signals under § 76.56(d)(3)(i) or (ii) shall be the responsibility of the cable operator.

(5) The requirements set forth in paragraph (d)(3) of this section shall cease to be effective three years from the date on which all full-power television stations cease broadcasting analog signals, unless the Commission extends the requirements in a proceeding to be conducted during the year preceding such date.

* * *

## 47 C.F.R. § 76.56 (2012)

* * *

(d) Availability of signals.

(1) Local commercial television stations carried in fulfillment of the requirements of this section shall be provided to every subscriber of a cable system. Such signals shall be viewable via cable on all television receivers of a subscriber which are connected to a cable system by a cable operator or for which a cable operator provides a connection.

(2) Qualified local NCE television stations carried in fulfillment of the carriage obligations of a cable operator under this section shall be available to every

A17

subscriber as part of the cable system's lowest priced service tier that includes the retransmission of local commercial television broadcast signals.

* * *

## CERTIFICATE OF SERVICE

I, Helgi C. Walker, hereby certify that on November 9, 2012, I electronically filed the foregoing documents with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.   The following participants in the case will be served by the CM/ECF system:

Jacob M. Lewis
Richard Kiser Welch
Laurence N. Bourne
Joel Marcus
Federal Communications Commission
Office of the General Counsel
Room 8-A741
445 12th Street, S.W.
Washington, DC 20554

*Counsel for the Federal
Communications Commission*

Kristen C. Limarzi
Robert B. Nicholson
U.S. Department of Justice
Antitrust Division/Appellate Section
950 Pennsylvania Avenue, NW
Room 3224
Washington, DC 20530-0001

*Counsel for the United States
of America*

Andrew Jay Schwartzman
2000 Pennsylvania Avenue, NW
Suite 4300
Washington, DC 20006

*Counsel for Intervenor National
Hispanic Media Coalition*

Michael S. Schooler
Diane B. Burstein
National Cable & Telecommunications
Association
25 Massachusetts Avenue, NW
Suite 100
Washington DC 20001-1431

*Counsel for Intervenor National Cable
& Telecommunications Association*

Richard P. Bress
Matthew A. Brill
Katherine I. Twomey
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

*Counsel for Intervenor Time Warner
Cable Inc.*

The following participants in the case will be served by first class U.S. mail, postage prepaid:

Rick Chessen
National Cable & Telecommunications
Association
25 Massachusetts Avenue, NW
Suite 100
Washington DC 20001-1431

*Counsel for Intervenor National Cable
& Telecommunications Association*

Amanda E. Potter
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

*Counsel for Intervenor Time Warner
Cable Inc.*

*/s/ Helgi C. Walker*
Helgi C. Walker